UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| C&C PROPERTIES, INC., et al.,<br><br>    Plaintiffs,<br><br>    v.<br><br>SHELL COMPANY, et al.,<br><br>    Defendants. | Case No.: 1:14-cv-01889 -JAM-JLT<br><br>FINDINGS AND RECOMMENDATIONS GRANTING IN PART PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION<br><br>(Docs. 19, 25) |

       Plaintiffs C&C Properties; JEC Panama, LLC; and Wings Way, LLC own 138 acres of undeveloped land in Bakersfield, California. Defendants Shell Company and Alon USA Paramount Petroleum Corporation currently operate high-pressure oil and gas pipelines on Plaintiffs' property. Plaintiffs seek a preliminary injunction pursuant to Rule 65 of the Federal Rules of Civil Procedure against Shell and Alon, requesting that the Court either order defendants to cease using their pipelines, or require the defendants to relocate or remove the pipelines. (Docs. 19, 25.) Defendants Shell and Alon oppose the motion, arguing the pipelines are not subject to relocation or cessation of use agreements, and that Plaintiffs are not likely to succeed on their claims. (Docs. 39, 41.)

       The Court heard the oral arguments of the parties on July 6, 2015.[1] Because the Court finds

---

[1] Since the hearing on the motion for preliminary injunction, the parties have attempted to settle the matter and have succeeded in part. They have agreed that Shell and Alon will move two of the pipelines but continue to disagree as to Shell's 14" pipeline. (Doc. 67 at 2) Thus, the Court deems the motion as to the Alon pipeline and Shell's 12' pipeline to be **MOOT**. References herein to Alon or the other pipelines is only to provide a clearer picture of the situation.

1

that Plaintiffs have demonstrated a likelihood they will succeed on the merits of some of their claims and have demonstrated the likelihood of imminent, irreparable harm will result if the motion is denied, the Court recommends Plaintiffs' motion for a preliminary injunction be **GRANTED**.

## I.     Background and Procedural History

In June 2013, Plaintiffs purchased 138 acres of undeveloped land from Chevron USA. (Doc. 32 at 4) During the due diligence period prior to the close of escrow, Chevron disclosed three easements recorded on the property. (Doc. 19-1 at 2-3) The easements indicated that pipelines exist in the southeast corner and also that pipelines exist on the property and run in a north-easterly direction beginning midway along the southern border of the property. Id. at 19-1 at 3. The easements did not indicate the presence of the pipelines along the frontage of the property. Id.

Chevron granted each of the three easements to Shell Oil. By their express terms, each permitted Shell to locate pipelines within the easements. (Doc. 19-2 at 8, 17, 21) The easement agreements allowed the grantor to terminate the easement with 60 days' notice. (Doc. 19-2 at 9, 17, 21) Likewise, each agreement indicated that if the pipeline was not maintained or used for a period of one year, the easement would terminate. Id. Finally, each agreement prohibited assignment of the easements without the written consent of the grantor. Id. With this information in hand, Plaintiffs completed the purchase of the property at a cost of nearly $4 million. (Doc. 49-1 at 30)

After escrow closed, Plaintiffs determined that the pipelines were not confined to the premises described in the easements. (Doc. 19-1 at 3) Plaintiffs discovered that pipelines spanned the entire frontage of the property parallel to Merle Haggard Drive. Id. Plaintiffs discovered also there were other unrecorded easements that Chevron had issued.[2]

Because development of the property required road improvements along Merle Haggard Drive, the pipelines running along the frontage posed an engineering impediment. (Doc. 19-1 at 2, 3) Thus, in June 2014, Plaintiffs demanded Shell lower its pipelines to a depth of eight feet and situate them within the boundaries of the controlling easement. (Doc. 19-2 at 27-39) Shell responded by noting that it was operating a pipeline on the property but it was subject to an entirely different easement granted by

---

[2] Because the dispute now is limited to the 14" pipeline, no further discussion about the other pipelines is included here.

2

Chevron to Getty Oil in 1982.  (Doc. 19-2 at 41-44; Doc. 49-1 at 17)  This easement allowed for two pipelines on the property for the transportation of petroleum products. (Doc. 19-2 at 41)  Like the other easement agreements, this contract expressly allowed the grantor to terminate the easement or require the relocation or lowering of the pipelines, if they interfered with the use of the property.   Id. at 42.  In this event, the grantor agreed to give 60 days' notice before termination. Id.  However, this "termination" clause was deemed unenforceable if a governmental entity "acquired in any manner" the easement. (Doc. 19-2 at 41)    Likewise, upon termination of the easement, the grantee was obligated to remove the pipe and restore the premises to its condition prior to the construction of the pipeline.  Id. Finally, the agreement prohibited assignment except with the written consent by the grantor.  Id. Despite this, Getty assigned the easement to Shell in 2002 without written consent by Chevron.  (Doc. 32 at 8; Doc. 49-1 at 17) Though Plaintiffs demanded Shell relocate or remove the pipelines, Shell refused.³  (Doc. 32 at 8-9)

      Shell conducted "potholing" to determine the depth of its 14" pipeline located on the property and shared the resulting data with Plaintiffs.  (Doc. 69 at 2)  Three road contractors reviewed the data and determined the pipeline was not low enough below ground level to allow them to construct a roadway over it.  Id.  Likewise, Plaintiffs' civil engineer determined that as much as 860' of the pipeline must be lowered or relocated before work on the expansion of Merle Haggard Drive could begin.  (Doc. 68 at 4)  This opinion was based upon the potholing data that showed that the 14" pipeline located within the subject property, at least in certain of the potholed areas, is located less than three feet below the scarification depth.  (Doc. 68 at 3-4) Shell does not dispute or counter these conclusions.

      Predating the Chevron-to-Getty easement, in 1981, Chevron granted to the County of Kern an easement for a "public highway . . . and not otherwise." (Doc. 41-3 at 53-59)  The County constructed Merle Haggard Drive on the easement area.  Id.  In this easement, Chevron expressly reserved in itself and its assigns, the right to lay, replace, construct, maintain and repair pipelines for the transport of petroleum products and to "increase the number of and remove pipelines and appurtenances thereof,"

---

³ As noted above, the parties have come to an agreement related to Shell's 12" pipeline that was located on the property.

for the entire time the property is used as a road in certain areas of the easement.[4]  Id.  Though the County could terminate Chevron's right to maintain these pipelines, if the County did so it was obligated to relocate/reconstruct the pipelines at the County's "sole cost." Id. 53-54.  Alternatively, if the grantor abandoned any pipelines and gave written notice of this abandonment, the pipeline became the property of the County, and the public entity assumed all responsibility for it.  Id.

Chevron issued a second "easement of right of way" to the County of Kern in 2005 to allow the future construction of the "turn apron" of "Wings Way" which will intersect Merle Haggard Drive when it is built. (Doc. 39-2 at 4)  This easement agreement also restricted the use of the property to "highway purposes."  Id. at 39-2 at 15-16.

Further complicating the issues, the County of Kern issued franchise agreements to Shell allowing it to lay and maintain pipelines "in and under any and all public highways now or hereafter dedicated to public use." (Doc. 39-2 at 20-21, 30, 39) The County issued these franchise agreements in 1970 (Id. at 20-26) and in 1991 (Id. at 28-34) made amendments to the 1991 agreement in 1993 (Id. at 36-40).  In the original franchise, Shell's rights existed for 20 years as to any roadway within the County of Kern's jurisdiction.  Id. at 20-21.  The latter franchise agreement and its amendment limited Shell's rights to certain parcels of land—which includes the property at issue here—and restricted Shell's use to the installation of oil and gas "pipelines not exceeding fourteen inches ("14") in diameter."  Id. at 30, 31.

In the motion for preliminary injunction, Plaintiffs seek an order requiring Shell to remove the 14" pipeline or to relocate it to be fully within the easement area but at a depth that would allow sufficient cover such to build the roadway.  In support of this position, Plaintiffs argue that it has entered into a purchase agreement for a portion of the property which required them to deliver an approved subdivision no later than January 15, 2015 or within 15 days of a demand.  (Doc. 19-1 at 5; Doc. 32 at 10)  Failure to deliver the approved subdivision map upon demand, would entitle the

---

[4] Chevron reserved for itself the right to maintain and add pipelines wherever they lay within the easement but agreed that in future, "all pipe, poles, wires, conductors, cables and conduits, and appurtenances thereof which are laid or constructed by virtue of this exception and reservation shall be located within . . . The Easterly 220 feet of the above described parcel [and] The Westerly 30 feet of the above described parcel" though any of Chevron's facilities existing on the property—no matter their location—were permitted to remain in the land. (Doc, 39-2 at 11-12)

4

purchaser to demand title to the entirety of the property at issue, not merely the portion the purchaser has agreed to buy. Id.

In addition, Plaintiffs argue that if the pipeline remains where it is and at its current depth, Plaintiffs would be limited to developing only 15 of the 138 acres despite that Plaintiffs had intended to develop 110 acres when they purchased the property. (Doc. 19-1 at 5)  Finally, Plaintiffs argue that if they are restricted to developing only the 15 acres, the costs would increase due to the current location of the pipeline. Id.

## II.     Preliminary Injunctions

"The purpose of preliminary injunction is merely to preserve the relative position of the parties until a trial on the merits can be held." Univ. of Texas v. Camenisch, 451 U.S. 390, 395 (1981).  A preliminary injunction may be either mandatory or prohibitory. See Rouser v. White, 707 F.Supp.2d 1055, 1061 (E.D. Cal. 2010).  In general, a mandatory injunction is one that orders a party to "take action," while a prohibitory injunction is one that "restrains" a party from further action. Meghrig v. KFC Western, Inc., 516 U.S. 479, 484 (1996).  Importantly, while a prohibitory injunction preserves the status quo, a mandatory injunction goes well beyond maintaining the status quo pending litigation. Stanley v. University of S. Cal., 13 F.3d 1313, 1320 (9th Cir. 1994).  Because mandatory injunctions do not only preserve the status quo, they are "particularly disfavored," and the Ninth Circuit observed that "courts should be extremely cautious about issuing a preliminary injunction." Martin v. Int'l Olympic Committee, 740 F.2d 670, 675 (9th Cir. 1984).  The Court should deny a request for a mandatory injunction "'unless the facts and law clearly favor the moving party.'" Stanley, 13 F.3d at 1320 (quoting Anderson v. United States, 612 F.2d 1112, 1114 (9th Cir. 1979)).  Here, Plaintiffs seek a preliminary injunction compelling Shell to cease the use of the pipeline and/or remove or relocate it. Accordingly, the relief requested is both mandatory and/or prohibitory in nature.

To obtain a preliminary injunction, a plaintiff "must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." Winter, 555 U.S. at 20. The Ninth Circuit determined that a party seeking a preliminary injunction "must demonstrate that it meets all four of the elements of the preliminary injunction test established in Winter." DISH Network

1  Corp. v. FCC, 653 F.3d 771, 776 (9th Cir. 2011).  The moving party carries the burden to make "a clear
2  showing" that the Winter elements are satisfied. See Lopez v. Brewer, 680 F.3d 1068, 1072 (9th Cir.
3  2012) (quoting Mazurek v. Armstrong, 520 U.S. 968, 972 (1997)).

In evaluating a request for a preliminary injunction, the Court may weigh the moving party's request on a sliding-scale approach. Alliance for the Wild Rockies v. Cottrell, 632 F.3d 1127, 1135 (9th Cir. 2011).  Accordingly, a stronger showing on the balance of hardships may support the issuance of a preliminary injunction where there are "serious questions on the merits … so long as the plaintiff also shows that there is a likelihood of irreparable injury and that the injunction is in the public interest." Id.; see also Global Horizons, Inc. v. U.S. Dep't of Labor, 510 F.3d 1054, 1057-58 (9th Cir. 2007) (explaining "the relationship between success on the merits and irreparable harm [is] a sliding scale in which the required degree of irreparable harm increases as the probability of success decreases," but that "a moving party must, at an 'irreducible minimum' demonstrate some chance of success on the merits").

### III. Evidence that may be considered by the Court

The Ninth Circuit has determined that "[d]ue to the urgency of obtaining a preliminary injunction at a point when there has been limited factual development, the rules of evidence do not apply strictly to preliminary injunction proceedings."  Herb Reed Enters. v. Fla. Entm't Mgmt., Inc., 736 F.3d 1239, 1250 n.5 (9th Cir. 2013).  It is "within the discretion of the district court to accept . . . hearsay for purposes of deciding whether to issue [a] preliminary injunction." Republic of the Philippines v. Marcos, 862 F.2d 1355, 1363 (9th Cir. 1988).

### IV. Discussion and Analysis

#### A. Likelihood of success on the merits

A plaintiff need only show success on the merits is likely for one claim, not all claims to meet the burden of establishing an entitlement to a preliminary injunction. Fin. Express LLC v. Nowcom Corp., 564 F. Supp. 2d 1160, 1169 (C.D. Cal. 2008); see also Californians for Alternatives to Toxics v. Troyer, 2005 U.S. Dist. LEXIS 37270 at *8, n.8, (E.D. Cal. Aug. 31, 2005) ("plaintiffs need only show a likelihood of success on the merits/serious questions as to *one* of their claims," emphasis in original).

///

1. Breach of contract

A claim of breach of contract arises under California law, and requires a plaintiff to demonstrate (1) the existence of a contract, (2) performance or excuse for nonperformance by the plaintiff, (3) breach by the defendants, and (4) resulting damages. Alcalde v. NAC Real Estate Invs. & Assignments, Inc., 316 Fed. App'x 661, 662 (9th Cir. 2009) (citing First Comm. Mort. Co. v. Reece, 108 Cal. Rptr. 2d 23, 33 (Ct. App. 2001)); see also Haberbush v. Clark Oil Trading Co., 33 Fed. App'x 896, 898 (9th Cir. 2002) (identifying "agreement, consideration, performance by plaintiff, breach by defendant, and damages" as elements to a breach of contract).

In the first cause of action, Plaintiffs expressly allege that pipelines belonging to Shell Pipeline and Alon "do currently exist on the 747 Easement and the 765 Easement." (Doc. 32 at 11-12)  Plaintiffs allege that the easement agreements allow termination at Plaintiff's discretion and that Plaintiffs have demanded the removal of the pipelines according to the terms of the easements and that Shell and Alan have refused. Id. at 12.  Nevertheless, in the motion for preliminary injunction, Plaintiffs admit, "None of the Frontage Pipelines is contained in any recorded easements." (Doc. 19 at 8; Doc. 19-1 at 8)  Rather, it appears that the pipelines located along the frontage of the property parallel to Merle Haggard Drive, if contained in any easement, are contained in unrecorded easements or within the easement granted to the County of Kern for the roadway of Merle Haggard Drive.

At the hearing, Plaintiffs argued that the first cause of action is expansive enough to address a breach of the unrecorded easements; the Court disagrees.  The first amended complaint expressly refers to the two recorded easements and it does not mention in any way the unrecorded easement or terms found within them.  This is most striking because the second through fourth causes of action refer to both the recorded and unrecorded easements.  Thus, the Court does not agree that the first cause of action gives fair notice that Plaintiffs are seeking to enforce the terms of the unrecorded easement.  Based upon the state of the evidence—that the frontage pipelines are not contained within the recorded easements—whether Plaintiffs will prevail on the merits of the breach of contract claim related to the recorded easements provides no assistance here where the pipelines are associated, at most, with the unrecorded easements.

///

2.     Trespass

"A trespass is an invasion of the interest in the exclusive possession of land, as by entry upon it." Capogeannis v. Superior Court, 15 Cal. Rptr. 2d 796, 799 (1993). "The cause of action for trespass is designed to protect possessory—not necessarily ownership—interests in land from unlawful interference." Smith v. Cap Concrete, Inc., 133 Cal. App. 3d 769, 774 (1982) (citing Allen v. McMillion, 82 Cal.App.3d 211, 218 (1978)). "A trespass may be committed by the continued presence on the land of a structure, chattel, or other thing which the actor has tortiously placed there, whether or not the actor has the ability to remove it." Newhall Land & Farming Co., 23 Cal. Rptr. 2d at 383 (internal quotations and citation omitted).

**a.     Whether Defendants installed the pipelines according to an easement, the failure to remove the pipelines as demanded constitutes a trespass**

Shell argues the trespass claim will fail because the pipeline was installed according to an easement granted by Chevron. (Doc. 39 at 22) Shell notes that the first amended complaint alleges that Defendants have "entered on the Subject Property" and through their conduct have demonstrated an intention to continue to trespass. (Doc. 32 at 15-16) However, this is an overly narrow reading of the trespass claim. Ignored by Shell is the language of the complaint alleging Plaintiffs have demanded Defendants to remove the pipelines and Defendants have refused to comply. Id. at 16.

"The essence of the cause of action for trespass is an unauthorized entry onto the land of another." Donahue Schriber Realty Grp., Inc. v. Nu Creation Outreach, 232 Cal.App.4th 1171, 1177–78, 181 Cal.Rptr.3d 577 (citing Cassinos v. Union Oil Co., 14 Cal.App.4th 1770, 1778 (1993)) (internal quotation marks omitted). "The intent required as a basis for liability as a trespasser is simply an intent to be at the place on the land where the trespass allegedly occurred.... The defendant is liable for an intentional entry although he has acted in good faith, under the mistaken belief, however reasonable, that his committing no wrong." Id. (citing Miller v. National Broadcasting Co., 187 Cal.App.3d 1463, 1480–81 (1986)) (internal quotation marks omitted). On the other hand, "a trespass may occur if the party, entering pursuant to a limited consent, i.e., limited as to purpose or place, proceeds to exceed those limits by divergent conduct on the land of another. A conditional or restricted consent to enter land creates a privilege to do so only in so far as the condition or restriction is complied with." Id.

8

1 (citing Cassinos, 14 Cal.App.4th at 1778) (internal quotation marks omitted).

2     The first amended complaint indicates the unrecorded easements, upon which Defendants relied when installing the pipelines, contain a termination clause that was identical to those contained in the recorded easements. (Doc. 53 at 6, 8, 27) Plaintiffs allege they demanded removal of the pipelines according to these termination clauses and that Shell failed to comply. (Id. at 8, 28) Thus, no matter whether Defendants placed the pipelines with permission of the easement grantor, their refusal to remove the pipelines as demanded by Plaintiffs constitutes a trespass.

        **b.    There is no evidence the franchise agreement granted by the County of Kern overrides Defendant's contractual obligations**

    Shell reports that it constructed the 14" pipeline in 1984 based upon the authority granted to it by the County of Kern in the franchise agreement issued in 1970. (Doc. 39-2 at 5) By this time, Merle Haggard Drive was in place, having been built in 1981 after Chevron granted County the easement right-of-way for his purpose. Id. at 5, 11-12.

    The franchise agreement, first issued on August 20, 1970, permitted Shell to place oil and gas pipelines under any County road that was dedicated to public use. (Doc. 39-2 at 20-26) The franchise had a set term of 20 years. Id. at 21. On August 15, 1991[5], the County granted a second franchise to Shell allowing it to place "nonpublic utility" oil and gas pipelines in certain unincorporated areas within the county, "in and under any and all public highways now or hereafter dedicated to public use." Id. at 28-34. As in the earlier franchise, the term of the agreement was 20 years. Id. at 31. Once the term expired, if it was not replaced with a subsequent franchise, Shell was obligated to "remove all franchise facilities from the public roads at grantee's sole expense." Id. at 32. On June 17, 1993, the parties amended the 1991 franchise in ways that do not impact the issues presented here. Id. at 39-40. The amendment did not change the term of the 1991 franchise.[6] Id. at 40 ["Except as expressly amended herein, all provisions of Ordinance No. F-354 shall remain in full force and effect."].

---

[5] Though this was 21 years after the original easement was issued, it does not appear that the County of Kern enforced the expiration of the prior franchise. (Doc. 39-2 at 21)

[6] Shell has presented evidence that County has issued a subsequent franchise agreement but, due to a typographical error, it fails to apply to the property at issue. (Doc. 71 at 4) This error is being corrected. Id. In any event, presumably, the authority to enforce the franchise agreement and the effects of its expiration rests with the parties to that agreement and that County may forbear Shell's continued operation of the pipeline beyond the expiration of the franchise.

1 In its papers, Shell does not discuss the source of County's authority to issue the franchise, at least as it relates to the property. Notably, the Chevron-to-County easement did not grant to County the authority to permit pipelines to be constructed under the roadway. (Doc. 39-2 at 11) Rather, that agreement provided County "an easement for use as a public highway by said County, **and not otherwise**, over and across that portion of the Southeast quarter of Section 34, Township 28 South, Range 27 East, MDM, County of Kern, State of California . . ." Id., emphasis added. The easement reads,

> This easement is given upon the express condition that it shall be used **only as a public highway, and** if it is not so used, or **if it is used for any other or additional purpose whatsoever, Grantor,** its successors or assigns, **may thereupon re-enter and take and hold possession of said parcel free of said easement**.
> **This easement is given subject** to all valid and existing licenses, leases, grants, exceptions and **reservations affecting said premises, but more particularly subject to the reservations**, conditions and covenants **hereinbefore made**, and each of them.

(Doc. 71 at 8, emphasis added)

Notably, Chevron expressly reserved in itself the right to maintain its pipelines currently in place and to add pipelines provided that the new pipelines were located in [t]he Easterly 220 feet of the above described parcel [and] [t]he Westerly 30 feet" of the easement. (Doc, 39-2 at 11-12) Even if this could be understood to mean that the County could allow pipelines to be installed in the area between the easterly 220 feet and the westerly 30 feet of the easement area, there is no dispute that Shell's 14" pipeline intrudes into the area reserved to Chevron.

In any event, generally, when the agreement grants to the public entity an easement "for street purposes," "highway purposes," or for a "right-of-way," this language is construed to mean that the public acquires all rights in the property acquired under the easement that is needed "in the conveyance of goods and people." Bello v. ABA Energy Corp., 121 Cal.App.4th 301, 313, 318 (2004). However, while this is the general rule, the extent to which the fee interest vests in the public depends upon the express language of the grant. Id. at 318 ["Only where the right-of-way conveyance is shown to contain specific language beyond the general reference to a road or highway have courts been guided by the specific language of the grant."]

In Radford Ventures, LLC v. S. California Gas Co., 2014 WL 950247, at *4 (Cal. Ct. App. Mar. 12, 2014), the court considered whether the Gas Company, through its franchise agreement with the

1 city, could place a meter within the city's right-of-way. Id.  The selected placement meant that the meter was located partially on the property of a neighbor.  Id.

In considering the objection posed by the neighbor, the court noted that the franchise granted to the Gas Company by the city allowed it "lay and use 'pipes and appurtenances' 'under, along across or upon' the streets."  Radford Ventures, 2014 WL 950247, at 3.  The court noted also that the city's right-of-way easement, granted by the property owner, was limited to use as "a public street or alley."  Id., at *2.  Thus, whether the franchise entitled the Gas Company to place the meter in the location at issue depended upon the authority of the City to grant the franchise.  Id.  The court concluded, "The City . . . could not grant to the Gas Company greater rights than the city itself possessed."  Id.  Given the express language of the easement, the court concluded the city did not have the authority to allow the easement to be used for purposes other than as a street or alley.  Id. at 5.  As a result, the franchise agreement did not allow the Gas Company to place the meter within the easement's confines. Id.

Likewise, in Schmidt v. Bank of America, N.A., 223 Cal.App.4th 1489 (2014), the court was called upon to determine whether the grant of the easement which conveyed a "right of ingress and egress," created a public right-of-way such to allow usage of more than just the surface of the easement area.  Id. at 1498.  The court determined that,

> "[a]n easement is a restricted right to specific, limited, definable use or activity upon another's property, which right must be less than the right of ownership." (Mesnick v. Caton (1986) 183 Cal.App.3d 1248, 1261, 228 Cal.Rptr. 779.) "**It is fundamental that the language of a grant of an easement determines the scope of the easement**." (County of Sacramento v. Pacific Gas & Elec. Co. (1987) 193 Cal.App.3d 300, 313, 238 Cal.Rptr. 305 (County of Sacramento ).)

Id., emphasis added.  The court noted that it was obligated to determine the intent of the parties when contracting for the easement and if the intent can be derived from the plain meaning of the easement document, no further analysis is warranted.  Id.  Thus, the court determined that because the easement was limited to only ingress and egress, the easement conveyed nothing more than the right to locate a paved road.  Id. at 1498-1499.

Here, of course, the right to lay future pipelines within the easement granted to the County of Kern, was reserved expressly in the grantor.  The express language of the easement likewise provided County the easement for "a public highway . . . and not otherwise." (Doc. 41-3 at 53-59)  It also

11

provided for the recovery of the easement by Chevron if County used the property for purposes other than a public highway.  Defendants' suggestion that despite this clear limitation of County's rights to the easement area that, nevertheless, the County received the land in fee—or, at least, full rights to use the land to benefit the public—defies  the unambiguous language of the easement agreement and must be rejected.

### 2	Declaratory relief

In the complaint, Plaintiffs seek termination of the easements, arguing that the express terms of the easements required the written consent of the Grantor, which was not given by Chevron.  (See Doc. 1 at 13-14)  The Declaratory Judgment Act allows a federal court to "declare the rights and other legal relations" of parties to a "case of actual controversy."  28 U.S.C. § 2201; Spokane Indian Tribe v. United States, 972 F.2d 1090, 1091 (9th Cir. 1992). The Court has the discretion to determine whether to entertain an action for declaratory relief, because the Declaratory Judgment Act "gave the federal courts competence to make a declaration of rights; it did not impose a duty to do so."  Public Affairs Assoc. v. Rickover, 369 U.S. 111, 112 (1962); Gov't Employees Ins. Co. v. Dizol, 133 F.3d 1220, 1223 (9th Cir. 1998).  A declaratory relief claim operates "prospectively," not to redress past wrongs.  Britz Fertilizers, Inc. v. Bayer Corp., 665 F.Supp.2d 1142, 1173 (E.D. Cal. 2009).

The Ninth Circuit determined that "[d]eclaratory relief is appropriate (1) when the judgment will serve a useful purpose in clarifying and settling the legal relations in issue, and (2) when it will terminate and afford relief from the uncertainty, insecurity, and controversy giving rise to the proceeding." Eureka Fed. Sav. & Loan Assoc. v. American Cas. Co., 873 F.2d 229, 231 (9th Cir. 1989). To determine whether a controversy invokes declaratory relief, the Court must determine whether there is a "substantial controversy, between parties having adverse legal rights, or sufficient immediacy and reality to warrant the issuance of a declaratory judgment." Maryland Cas. Co. v. Pacific Coal & Oil Co., 312 U.S. 270, 273 (1941).

As an equitable remedy, declaratory relief is "dependent upon a substantive basis for liability." Glue-Fold, Inc. v. Slautterback Corp., 82 Cal.App.4th 1018, 1023, n. 3 (2000).  Because Plaintiffs have shown they are likely to succeed on the merits of trespass claim, they have also shown they are likely to succeed in obtaining determination of the rights and interests of the parties related to the property.

####    4.      Interference with economic advantage

To prevail on a claim for intentional interference with economic advantage, a plaintiff must establish: "(1) an economic relationship between the plaintiff and some third party, with the probability of future economic benefit to the plaintiff; (2) the defendant's knowledge of the relationship; (3) the defendant's intentional acts designed to disrupt the relationship; (4) actual disruption of the relationship; and (5) economic harm to the plaintiff proximately caused by the defendant's acts." Reeves v. Hanlon, 33 Cal. 4th 1140, 1152, n. 6 (2004) (citing Youst v. Longo, 43 Cal.3d 64, 71, n. 6 (1987)).

In this case, Plaintiffs assert they "have lost a number of profitable deals to sell parcels of the Property." (Doc. 19 at 17) According to Plaintiffs, "Several interested buyers presented letters-of-intent to Plaintiffs, but ultimately withdrew their interest because, as a direct result of the Frontage Pipelines, Plaintiffs were unable to comply with the interested buyers' timelines." (Id., citing Carver Decl. ¶ 18) Significantly, however, Plaintiffs have not presented any evidence that Defendants were aware of these potential deals or any economic relationship between Plaintiff and other parties. Thus, Plaintiffs fail to show a likelihood of success on the merits for this claim.

### B.     Irreparable Harm

The propriety of a request for injunctive relief hinges on a significant threat of imminent irreparable harm. Caribbean Marine Serv. Co. v. Baldridge, 844 F.2d 668, 674 (9th Cir. 1988). Thus, a plaintiff must demonstrate an *immediate* irreparable harm as a prerequisite to preliminary injunctive relief. Los Angeles Memorial Coliseum Com. v. Nat'l Football League, 634 F.2d 1197, 1201 (9th Cir. 1980). A speculative injury is not sufficient support the issuance of a preliminary injunction. Goldie's Bookstore, Inc. v. Superior Court, 739 F.2d 466, 472 (9th Cir. 1984).

As an initial matter, Plaintiffs delayed in seeking an injunction against the defendants for more than five months after the sixty-day notice period expired. Because Plaintiffs made the request in June 2014, they expected action by Shell and Alon no later than August 2014. Yet Plaintiffs did not file a complaint against Shell and Alon until November 2014, and did not file the motion for a preliminary injunction until February 2015. This delay in taking action suggests that there is not an *imminent* threat to Plaintiffs. Hansen Beverage Co. v. Vital Pharmaceutical, Inc., 2008 WL 5427601, at *6 (S.D. Cal.

Dec. 30, 2008) ("Delays in requesting an injunction, whether for months or years, tend to negate a claim of irreparable harm"). Despite this appearance, Plaintiffs report are at "risk of forfeiting the entire Property to the purchaser" of a parcel as of January 15, 2015. (Doc. 19 at 14)

Specifically, Plaintiffs report they sold a parcel of the property, which required them "to submit a new map to the County for subdivision approval." (Doc. 19 at 16, citing Carter Decl. ¶ 17) Plaintiffs assert that "the map cannot be completed, and County approval cannot be obtained, until the County-required street, water, and sewer improvements are completed, and those cannot be completed because of the pipelines." Id. Pursuant to Plaintiffs' agreement with the purchaser, "without subdivision approved by January 15, 2015, which the Frontage Pipelines prevent, Plaintiffs are in imminent risk of forfeiting the entire Property to the purchaser." (Id. at 16-17) There is a "fundamental maxim that each parcel of land is unique." City of San Jose v. Superior Court, 12 Cal.3d 447, 461 (1974) (citing Cal. Civ. Code § 3387). "Although this rule was created at common law, the very factors giving it vitality in the simple days of its genesis take on added significance in this modern era of development. Simply stated, there are now more characteristics and criteria by which each piece of land differs from every other." Id. at 461-62. Because real property is unique, the loss of an interest in real property cannot be compensated with money alone. Sundance Land Corp. v. Cmty. First Fed. Sav. & Loan Ass'n, 840 F.2d 653, 661-62 (9th Cir. 1988) ("Since the property at issue is unique, [plaintiff's] legal remedy—i.e., damages—is inadequate.")

Plaintiffs argue also that delay in development of the property risks their "first to market" advantage. (Doc. 49 at 17) Indeed, at the hearing, Mr. Carver testified that when he purchased the property, there were no other competitive developments in the area and, specifically, there were no other developed industrial parcels. Carver testified they intended their property to be the first of this type. He testified that now there are other competitive developments located in the area, including a 121 acre development just across Merle Haggard Drive from the subject project. While these other projects are not "further along" in their development stage than Plaintiffs' property, they have "caught up" to the same stage of development as the subject property. Thus, Plaintiffs argue they are at great risk of losing their competitive advantage.

While Defendants argue this lost opportunity can be compensated assuming Plaintiffs succeed

14

in their litigation, they fail to demonstrate how this loss of competitive advantage can be measured. *See* Bracco Diagnostics, Inc. v. Shalala, 963 F. Supp. 20, 29 (D.D.C. 1997). Clearly, absent a reliable measure of damages, compensation will be denied as speculative. Thus, it appears likely this injury will not be compensable either in this action or from the open market given the greater competition faced by Plaintiffs due to the competing developments. Therefore, Plaintiffs have identified sufficient imminent irreparable harm[7], and this factor weighs in favor of the issuance of a preliminary injunction. See id.

### C. Balancing of equities

Plaintiffs argue they "would suffer extraordinary and unfair burdens without immediate relief." (Doc. 19 at 23) According to Plaintiffs, "as a direct result of the Pipeline Operators refusal to relocate the Frontage Pipelines, Plaintiffs can only develop approximately 15 acres of the 138- acre Property." (Id. at 17, citing Carter Decl. ¶ 19) Plaintiffs assert:

> It is impossible for Plaintiffs to precisely calculate the risks and losses flowing from the Pipeline Operators' breach because of the uniqueness of the Property, the volatility of market and regulatory factors, and the long approximately 30-month delay to relocate the electrical transmission tower to accommodate the Frontage Pipelines. However, had the Frontage Pipelines been timely relocated making the Property available to develop, development would have completed in about September 2015, increasing the December 2014 "as is" market value of approximately $6.5 million to an aggregate retail value of approximately $16.6 million. (*Id.*) In today's declining market, however, this return likely will be reduced up to 30-40%. (*Id.*)

(Id.) Further, Plaintiffs report that the County will not approve any road re-design plans if the pipelines are not either lowered or removed. (Doc. 49-1 at 5-6, Chambers Decl. ¶ 11)

Shell contends that it "will disproportionately suffer if the injunction is granted, as the use and operation of the long-standing pipelines will be immediately interrupted. . . " (Doc. 39 at 27, citing Felger Decl. ¶23; Doc. 41 at 21, citing Felger Decl. ¶23) However, Shell fails to demonstrate how long, if at all, the pipeline's flow will be interrupted during the lowering operation. It seems unlikely that the flow could not be diverted during this construction.

Shell argues also that it "can cost more than $500/ft to relocate an existing pipeline of measurable length in public roadways with heavy traffic due to the myriad of costs associated with

---

[7] Given the harm identified by Plaintiffs, the Court declines to address the loss of sales and additional costs incurred by Plaintiff for the development of the property.

15

pavement cutting/disposal, excavating within the street, reduced work hours (because it is a public street), traffic control, backfilling the pipeline trench with cement slurry, and replacing the existing roadway surface." (Doc. 39 at 16, citing Smart Decl. ¶ 11; Doc. 41 at 13, citing Smart Decl. ¶ 11) Therefore, Defendants believe it would "cost at least $700,000 on top of the normal relocation costs" to relocate the pipelines that are estimate to span 1,400 feet. (Id.)

Notably, however, the length of the pipeline at issue is that which will be under the new pavement of Merle Haggard Drive, not that which has already been covered—to the County's satisfaction—with pavement. Moreover, Mr. Smart does not assert that would be the cost to relocate the specific pipeline at issue here. (See Doc. 39-3 at 4, Smart Decl. ¶ 11) Further, Mr. Smart does not explain what the cost would be to *lower* the pipeline compared to removing it completely from the frontage of the property.

Moreover, Defendants argue "the road can be built with the pipelines in place – Plaintiffs will need to design a road that meets the requisite safety standards, but the relief sought is not the sole determinative factor as to whether the Subject Property will be developed." (Doc. 39 at 28) However, the evidence demonstrates that without lowering the pipeline such that the County will approve plans to expand Merle Haggard Drive, no development of the property may occur. Indeed, Plaintiffs report the County rejected the plans that left the pipelines in their current place. (Doc. 49-1 at 5, Chambers Decl. ¶ 12) Moreover, the County has informed Plaintiffs that "road redesign plans would be approved *if* the pipelines are lowered and the affected roadway section not elevated." (Id., emphasis added) Given the potential loss of the property and the inability of Plaintiffs to move forward without the relocation of the pipelines[8], compared to the monetary loss to Defendants, the Court finds Plaintiffs carried their burden to show the balance of equities tips in their favor.

D.     **Public Interest**

Plaintiffs assert, "Requiring the Pipeline Operators to relocate or stop operating the Frontage

---

[8] Defendants object that Plaintiff cannot move forward even with their pipelines moved because Chevron Pipeline also has a pipeline in the frontage of the property. (Doc. 39 at 29; Doc. 41 at 23-24) However, Plaintiffs have presented evidence that they can begin development by constructing a cement culvert over Chevron's pipeline if it is the only one remaining in the ground, or by constructing a cement slurry of the pipeline. (Doc. 49-1 at 7-8, Chambers Supp. Decl. ¶¶ 19-22) Thus, Defendants' arguments regarding the Chevron pipeline are without merit.

1 Pipelines would save the public from the increased risks of the Pipeline Operators' high-pressure oil
2 and gas pipelines running under a highway." (Doc. 19 at 24) In addition, Plaintiffs argue "there is a
3 public interest in upholding the law and having parties abide by their legal duties. (Id., citing In re PTI
4 Holding Corp., 346 B.R. 820, 832 (Bankr. Nev. 2006); J.C. Penney Co., Inc. v. Giant Eagle, Inc., 813
5 F.Supp. 360, 371 (W.D. Pa. 1992)). The Court agrees.

Because the pipeline must be lowered or removed for Plaintiffs to proceed with the development of the property and widening of Merle Haggard Drive, the public interest weighs in favor of the entry of a preliminary injunction.

### E. Posting of a Bond

Pursuant to Fed. R. Civ. P. 65(c), "[t]he court may issue a preliminary injunction or a temporary restraining order only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." However, "[t]he court has discretion to dispense with the security requirement, or to request mere nominal security, where requiring security would effectively deny access to judicial review." California ex rel. Van De Kamp v. Tahoe Regional Planning Agency, 766 F.2d 1319, 1325 (9th Cir. 1985), *amended on other grounds*, 775 F.2d 998 (9th Cir. 1985).

Here, Plaintiffs have not presented any evidence that posting a bond would impose a financial burden upon the company. Further, Defendants would suffer financial loss if pipeline is moved but Plaintiffs are later unable to prove their legal footing to require it.

At the hearing, Shell indicated the cost of moving the pipeline would be $500 per foot though, as demonstrated above, there was little showing the cost would be the same for lowering the pipeline and no explanation of costs if the current roadway is undisturbed. However, because Shell may choose to move the pipeline to located it fully under the paved roadway of Merle Haggard Drive or to move it completely away from the subject property, the Court will accept the $500 per foot cost estimate. Based upon the 860 feet that will need to be moved or lowered, the Court will recommend that Plaintiffs post a bond in the amount of $430,000.

### VI. Findings and Recommendations

Based upon the foregoing, Plaintiffs have met their burden to demonstrate they are likely to

succeed on the merits, they are likely to suffer irreparable harm without the injunction, that the balance of equities tip in their favor, and that the requested relief is in the public interest.  See Winter, 555 U.S. at 20; Lopez, 680 F.3d at 1072.

    Accordingly, **IT IS HEREBY RECOMMENDED**:

1. Plaintiffs motion for a preliminary injunction as to the 14" Shell pipeline be **GRANTED** and that Plaintiffs be directed to post a $430,000 bond with the Clerk of Court within ten days of an order adopting these Findings and Recommendations;

2. That Defendant Shell Company be directed to immediately lower the 14" pipeline in the frontage of the property to at least three feet below the scarification depth or to , relocate, or remove it at Shell's option;

3. That the Order become effective immediately upon the Court adopting these Findings and Recommendations and that continue to be in effect until the Court enters a final judgment in this action or otherwise lifts the injunction.

These Findings and Recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(1)(B) and Rule 304 of the Local Rules of Practice for the United States District Court, Eastern District of California. Within 14 days after being served with these Findings and Recommendations, any party may file written objections with the Court. Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations." The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order. Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991); Wilkerson v. Wheeler, 772 F.3d 834, 834 (9th Cir. 2014).

IT IS SO ORDERED.

  Dated:   **September 23, 2015**        **/s/ Jennifer L. Thurston**
                                                                      UNITED STATES MAGISTRATE JUDGE