1
2
3
4
5
6
7
8                        UNITED STATES DISTRICT COURT

9                    FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11   C & C PROPERTIES, et al.,                │   No. 1:14-cv-01889-DAD-JLT

12                    Plaintiffs,              │

13        v.                                   │   ORDER RESOLVING VARIOUS POST-
                                               │   TRIAL MOTIONS
14   SHELL PIPELINE COMPANY, et al.,           │
                                               │   (Doc. Nos. 250, 257, 258, 265, 266, 267)
15                    Defendants.              │

16

17        This matter is before the court on various post-trial motions. At the conclusion of trial,

18   judgment was entered in favor of plaintiffs and against defendants on plaintiff's cause of action

19   for trespass. (Doc. No. 29.) Defendants Alon Bakersfield Property, Inc. and Paramount

20   Petroleum Corporation (collectively "Alon") and defendant Shell Pipeline Company ("Shell")

21   have now moved for judgment as a matter of law, for a new trial, and to alter or amend the

22   judgment. (Doc. Nos. 250, 257, 258.) Plaintiffs C & C Properties, Inc., JEC Panama, LLC, and

23   Wings Way, LLC ("plaintiffs") have also moved to amend the judgment and, in addition, seek

24   attorneys' fees and prejudgment interest. (Doc. Nos. 265–267.) A hearing on all of these

25   motions was held on October 9, 2019. Attorneys Thomas Vogele and Timothy Kowal appeared

26   on behalf of plaintiffs. Attorneys Michael Matthias, Andrew Grossman, W. Ray Whitman,

27   Regina Jones, and Misty Foy appeared on behalf of defendant Alon, and attorneys Ray Cardozo

28   and Kevin Day appeared on behalf of defendant Shell. Having considered the parties' briefing

                                               1

and the arguments of counsel, the court now issues this order resolving the parties' various post-trial motions.

## BACKGROUND

The parties are familiar with the facts of this case, which have been set out in prior orders of this court and were presented to the jury at trial. At the conclusion of the trial, the jury unanimously found in favor of plaintiffs on their trespass cause of action. The jury awarded plaintiffs trespass damages in the amount of $670,824.00 against each defendant, for a total of $1,341,648.00. (Doc. No. 227 at 3.) In addition, pursuant to California Civil Code § 3334, the jury found that Shell had obtained benefits from its trespass in the amount of $33,901,692.00, and that Alon had obtained benefits from its trespass in the amount of $6,058,834.00. (*Id.*) Although the jury also found by clear and convincing evidence that both defendants had acted with malice, oppression, or fraud in connection with their trespassing on plaintiff's property, the jury declined to award any punitive damages. (*Id.* at 2; Doc. No. 228.)

## LEGAL STANDARDS

**A.     Motion for Judgment as a Matter of Law, Motion to Amend or Alter the Judgment, Motion for a New Trial**

Rule 50(a)(1) of the Federal Rules of Civil Procedure provides as follows:

> If a party has been fully heard on an issue during a jury trial and the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue, the court may: (A) resolve the issue against the party; and (B) grant a motion for judgment as a matter of law against the party on a claim or defense that, under the controlling law, can be maintained or defeated only with a favorable finding on that issue.

Federal Rule of Civil Procedure 50(b) governs renewed motions for judgment as a matter of law made ("JMOL") under Rule 50(a) and provides that the court may: "(1) allow judgment on the verdict, if the jury returned a verdict; (2) order a new trial; or (3) direct the entry of judgment as a matter of law." The Ninth Circuit has held:

> A Rule 50(b) motion for judgment as a matter of law is not a freestanding motion. Rather, it is a renewed Rule 50(a) motion. Under Rule 50, a party must make a Rule 50(a) motion for judgment as a matter of law before a case is submitted to the jury. If the judge denies or defers ruling on the motion, and if the jury then returns a

verdict against the moving party, the party may renew its motion under Rule 50(b). Because it is a renewed motion, a proper post-verdict Rule 50(b) motion is limited to the grounds asserted in the pre-deliberation Rule 50(a) motion. Thus, a party cannot properly "raise arguments in its post-trial motion for judgment as a matter of law under Rule 50(b) that it did not raise in its preverdict Rule 50(a) motion." *Freund v. Nycomed Amersham*, 347 F.3d 752, 761 (9th Cir. 2003) (citing Fed. R. Civ. P. 50 advisory committee's notes to the 1991 amendments ("A post trial motion for judgment can be granted only on grounds advanced in the preverdict motion.")); *Murphy v. City of Long Beach*, 914 F.2d 183, 186 (9th Cir. 1990) ("[Judgment notwithstanding the verdict] is improper if based upon grounds not alleged in a directed verdict [motion]." (brackets in original)); *see also* Fed. R. Civ. P. 50 advisory committee's notes to the 2006 amendments ("Because the Rule 50(b) motion is only a renewal of the preverdict motion, it can be granted only on grounds advanced in the preverdict motion."). However, Rule 50(b) "may be satisfied by an ambiguous or inartfully made motion" under Rule 50(a). *Reeves v. Teuscher*, 881 F.2d 1495, 1498 (9th Cir. 1989). Absent such a liberal interpretation, "the rule is a harsh one." *Nat'l Indus., Inc. v. Sharon Steel Corp.*, 781 F.2d 1545, 1549 (11th Cir. 1986).

*EEOC v. Go Daddy Software, Inc.*, 581 F.3d 951, 961 (9th Cir. 2009).

In considering a Rule 50 motion, the court must view the evidence in the light most favorable to the party in whose favor the jury returned a verdict and draw all reasonable inferences in favor of the non-moving party. *First Nat'l Mortg. Co. v. Fed. Realty Inv. Tr.*, 631 F.3d 1058, 1067 (9th Cir. 2011); *Lakeside–Scott v. Multnomah County*, 556 F.3d 797, 802 (9th Cir. 2009); *Josephs v. Pac. Bell*, 443 F.3d 1050, 1062 (9th Cir. 2006); *City Sols., Inc. v. Clear Channel Commc'ns*, 365 F.3d 835, 839 (9th Cir. 2004); *see also A.D. v. Cal. Highway Patrol*, 712 F.3d 446, 453 (9th Cir. 2013) (stating that when evaluating a Rule 50 motion the court should "give significant deference to the jury's verdict and to the nonmoving parties"). "A district court can set aside a jury verdict and grant JMOL only if, under governing law, there can be but one reasonable conclusion as to the verdict and only if there is no legally sufficient basis for a reasonable jury to find for that party on that issue." *Jules Jordan Video, Inc. v. 144942 Can. Inc.*, 617 F.3d 1146, 1155 (9th Cir. 2010) (internal citation and quotation omitted); *see also A.D.*, 712 F.3d at 453 ("Such a judgment is proper if the evidence, construed in the light most favorable to the nonmoving party, permits only one reasonable conclusion, and that conclusion is contrary to the jury's verdict.") (quoting *Pavao v. Pagay*, 307 F.3d 915, 918 (9th Cir. 2002)); *First Nat'l Mortg. Co.*, 631 F.3d at 1067–68 (stating that the court "must disregard evidence favorable to the

moving party that the jury is not required to believe, and may not substitute its view of the evidence for that of the jury"); *Lakeside–Scott*, 556 F.3d at 802 ("Judgment as a matter of law is proper when the evidence permits only one reasonable conclusion and the conclusion is contrary to that reached by the jury.") (quoting *Ostad v. Or. Health Scis. Univ.*, 327 F.3d 876, 881 (9th Cir. 2003)).

Rule 50 also provides that if the court does not grant a motion for JMOL, the movant may make an alternative request for a new trial pursuant to Rule 59. Fed. R. Civ. P. 50(b). A motion brought under Rule 59(e) may seek "'reconsideration of matters properly encompassed in a decision on the merits.'" *United States ex rel. Hoggett v. Univ. of Phoenix*, 863 F.3d 1105, 1108 (9th Cir. 2017) (quoting *Osterneck v. Ernst & Whinney*, 489 U.S. 169, 174 (1989)). This requires a "substantive change of mind by the court." *Id.* (quoting *Bordallo v. Reyes*, 763 F.2d 1098, 1102 (9th Cir. 1985)); *see also Tattersalls, Ltd. V. DeHaven*, 745 F.3d 1294, 1299 (9th Cir. 2014). Whether a Rule 59(e) motion should be granted is within the discretion of the district court. *McDowell v. Calderon*, 197 F.3d 1253, 1255 (9th Cir. 1999) (en banc); *see also Turner v. Burlington N. Santa Fe R. Co.*, 338 F.3d 1058, 1063 (9th Cir. 2003). In most contexts, such a motion "should not be granted, absent highly unusual circumstances, unless the district court is presented with newly discovered evidence, committed clear error, or if there is an intervening change in the controlling law." *McDowell*, 197 F.3d at 1255 (quoting *389 Orange St. Partners v. Arnold*, 179 F.3d 656, 665 (9th Cir. 1999)); *see also Brighton Collectibles, LLC v. Believe Productions, Inc*., Case No. 2:15-cv-00579-CAS(ASx), 2018 WL 1381894, at *6 (C.D. Cal. Mar. 15, 2018) (denying Rule 59(e) motion to reduce the jury's damage award, applying the "highly unusual circumstances" standard and finding the jury's award supported by substantial evidence). However, a district court may also grant such a motion if it is "necessary to correct manifest errors of law or fact upon which the judgment is based" or if "the motion is necessary to 'prevent manifest injustice.'" *Turner*, 338 F.3d at 1063; *see also Nelson v. Equifax Info. Servs., LLC*, 522 F. Supp. 2d 1222, 1238–39 (C.D. Cal. 2007) ("Since the jury's award of statutory damages is a manifest error of law, Defendant is not precluded from raising the issue in its 59(e) motion[.]").

/////

**B.     Motion for Attorneys' Fees**

"Rule 54 provides a federal procedural mechanism for moving for attorney's fees that are due under state law." *Cheffins v. Stewart*, 825 F.3d 588, 597 (9th Cir. 2016).  Where, as here, a federal district court exercises jurisdiction over a state law claim, the law of the forum state regarding the award of attorneys' fees should generally be followed "so long as state law does not run counter to a valid federal statute or rule of court[.]" *MRO Commc'ns, Inc. v. Am. Tel. & Tel. Co.*, 197 F.3d 1276, 1281 (9th Cir. 1999) (internal quotation marks omitted).

Awards of attorneys' fees in actions on a contract are governed by California Civil Code § 1717.  That provision provides, in relevant part, that

> [i]n any action on a contract, where the contract specifically provides that attorney's fees and costs, which are incurred to enforce that contract, shall be awarded either to one of the parties or to the prevailing party, then the party who is determined to be the party prevailing on the contract, whether he or she is the party specified in the contract or not, shall be entitled to reasonable attorney's fees in addition to other costs.

Cal. Civ. Code § 1717(a).  The primary purpose of that provision, as recognized by the California Supreme Court, is "to establish mutuality of remedy when a contractual provision makes recovery of attorney fees available to only one party, and to prevent the oppressive use of one-sided attorney fee provisions." *Trope v. Katz*, 11 Cal. 4th 274, 285 (1995).  Thus, § 1717 is construed broadly, and "reflects legislative intent that equitable considerations must prevail over both the bargaining power of the parties and the technical rules of contractual construction." *Hjelm v. Prometheus Real Estate Grp.*, 3 Cal. App. 5th 1155, 1168 (2016) (quoting *Int'l Indus., Inc. v. Olen*, 21 Cal. 3d 218, 224 (1978)).  To that end, courts have recognized that § 1717 applies "in a variety of circumstances extending beyond a direct breach of contract claim." *Id.* at 1170; *see also In re Baroff*, 105 F.3d 439, 442–43 (9th Cir. 1997) ("California courts liberally construe 'on a contract' to extend to any action as long as an action involves a contract and one of the parties would be entitled to recover attorney fees under the contract if that party prevails in its lawsuit.") (internal quotation marks and brackets omitted); *Santisas v. Goodin*, 17 Cal. 4th 599, 611 (1998) (noting that § 1717 applies "when a person sued on a contract containing a provision for attorney fees to the prevailing party defends the litigation by successfully arguing the inapplicability,

invalidity, unenforceability, or nonexistence of the same contract") (internal quotation marks omitted).

## ANALYSIS

**A.     Alon's Motion to Alter or Amend the Judgment, for a New Trial, and for Judgment as a Matter of Law (Doc. No. 250)**

    1.     <u>Whether the Award of Benefits Obtained Exceeds that Authorized by Law or Supported by the Evidence</u>

Alon argues that the jury's award of benefits obtained from trespass, which totaled $6,058,834.00 against Alon, cannot stand under California law in light of the evidence introduced at trial.

Alon first contends that "trespass benefits are not available at all in this instance, because any trespass by Alon was unintentional and premised upon a mistake of fact." (Doc. No. 250 at 9.) In support of this argument, Alon cites to California Civil Code § 3334(b)(2), which provides that "[i]f a wrongful occupation of real property subject to this section is the result of a mistake of fact of the wrongful occupier, the value of the use of the property . . . shall be the reasonable rental value of the property." Here, however, the time to assert mistake of fact as a defense to liability or as a limitation on damages has long since passed. "[M]istake of fact is an affirmative defense . . . that defendants are required to plead and prove." *Marich v. MGM/UA Telecomms., Inc.*, 113 Cal. App. 4th 415, 424 (2003) (internal citations omitted). The court's final pretrial order in this case incorporated by reference all of the affirmative defenses set forth in Alon's answer, however an examination of that answer reveals that Alon never asserted "mistake of fact" as a defense to any of plaintiffs' causes of action in this case. (Doc. Nos. 14; 158 at 11.) Because a mistake of fact defense was not incorporated into the court's final pretrial order, it was waived by operation of that order. (Doc. No. 158 at 11) ("ANY CAUSES OF ACTION OR AFFIRMATIVE DEFENSES NOT EXPLICITLY ASSERTED IN THE FINAL PRETRIAL ORDER UNDER POINTS OF LAW AT THE TIME IT BECOMES FINAL ARE DISMISSED AND DEEMED WAIVED.").

/////

Alon cannot now, after the conclusion of trial, attempt to litigate a defense that it neither alleged in its pleading nor argued to the jury.[1]

Alon next argues that even if plaintiffs are entitled to some measure of benefits obtained under § 3334, "[a]t most, Alon's benefits are limited to the transmission costs it avoided in using the pipeline on Plaintiffs' property," which equates to $204,000.00. (Doc. No. 250 at 8–9.) As Alon explains, it could have used a separate pipeline (known as the "So Cal pipeline") to transport gas instead of using the pipeline that crossed plaintiffs' property. (*Id.* at 11.) Alon opted not to use the So Cal pipeline because doing so was more expensive: testimony by Alon's witness Mark Denis established that use of the So Cal pipeline would have increased Alon's costs by roughly $12,000.00 per month. (Doc. No. 240 at 158.) When multiplied by the seventeen-month period during which the jury found Alon to have trespassed,[2] this yields a total benefit obtained by Alon of $204,000.00 under this theory.

To the extent Alon argues in advancing this contention that costs avoided is always the maximum measure of benefits obtained under § 3334, Alon is incorrect. "If the Legislature had wanted to limit the phrase 'benefits obtained' to costs avoided, it could easily have done so." *Starrh & Starrh Cotton Growers v. Aera Energy LLC*, 153 Cal. App. 4th 583, 604 (2007). Alon argues that $204,000.00 is nonetheless the proper measure of benefits obtained because in this case, plaintiffs produced no evidence that a higher amount was warranted. Plaintiffs' theory of benefits obtained by Alon was premised on trial exhibit 1487, which was admitted into evidence without objection. (Doc. No. 237 at 13.) That exhibit, as characterized by plaintiffs' counsel, represents "the delivery by month of natural gas through the pipeline that was in the frontage of

---

[1] Although the court expresses no opinion on the potential merits of a mistake of fact defense in light of Alon's waiver of the issue, the undersigned does note that Alon's argument is difficult to square with the jury's verdict. An "unintentional" trespass premised on a mistake of fact would seem to be wholly inconsistent with the jury's finding that the defendants acted with malice, oppression, or fraud in connection with their trespass.

[2] As noted by Alon, the jury appears to have found Alon trespassed for a total of seventeen months. Alon reached this conclusion by noting that in attorney Vogele's closing argument on behalf of plaintiffs, he stated to the jury that the dollar value of the natural gas Alon sent through the pipeline was $356,402.00 per month. (Doc. No. 241 at 84.) When multiplied by 17, that yields a total dollar amount of $6,058.834.00—precisely the amount awarded by the jury.

Mr. Carver's property" to Alon.  (*Id.* at 12–13.)  According to that exhibit, natural gas totaling

13,830,526 therms were sent through Alon's pipeline during the relevant period, and testimony

from Alon's witness George Stutzmann[3] established that during that same period, one therm was

priced at roughly 67 cents.  (*Id.* at 13.)  This equates to roughly $9,266,452.42 in terms of the

total value of the natural gas shipped through the offending pipeline by Alon.  Plaintiffs argue,

both in their closing argument and in their briefing, that all of this represents benefits obtained by

Alon directly resulting from their trespass, and is compensable as damages under Civil Code

§ 3334.

Alon argues, however, that that the amount of $9,266,452.42 is not properly construed as

a benefit obtained by Alon because it does not represent the amount of *profits* to Alon.

According to Alon, if anything, that amount represents a *cost* to it, since "Alon already paid for

the gas."  (Doc. No. 250 at 12.)  Defendant Alon accordingly seek to amend the judgment and

have the benefits obtained award against it reduced to a maximum of $204,000.00.

As stated, motions to amend or alter the judgment "should not be granted, absent highly

unusual circumstances, unless the district court is presented with newly discovered evidence,

committed clear error, or if there is an intervening change in the controlling law."  *McDowell*, 197

F.3d at 1255.  Alon does not suggest the existence of newly discovered evidence or an

intervening change in controlling law, leaving the issue of clear error.  However, on the evidence

presented at trial, the court cannot conclude that the jury committed clear error in awarding

benefits obtained in an amount greater than $204,000.00.  As discussed above, Stutzmann

testified at trial as to the amount of natural gas delivered to Alon that flowed through the pipeline

along the frontage of plaintiffs' property, and that the price of this natural gas was roughly $9.2

million dollars.  Alon may well be correct that it earned no profits as a result of refining this

natural gas, in the sense that it did not sell the gas to a customer.  However, the text of § 3334

does not confine benefits obtained solely to profits earned.  The evidence at trial was uncontested

---

[3]  Mr. Stutzman testified that at the time of trial he was the vice president of corporate
development for Alon and that at the time of the events in question in this action he was the
director of supply trading and business development at Delek, an entity acquired by Alon in 2017.

that although Alon's refinery remained on standby, the natural gas sent through the pipeline was nonetheless utilized at the refinery for purposes of upkeep. As plaintiffs' counsel has argued, one can only presume that this upkeep had substantial value to Alon given that unrefuted evidence, and that therefore the jury could have found that the utilization of natural gas for this purpose was a benefit obtained by Alon. This presumption is not only plausible, it is entirely reasonable—it would be odd indeed for a company to use millions of dollars' worth of natural gas to maintain its refinery if there was no economic rationale for doing so. A jury could easily have concluded that maintenance of Alon's refinery constituted a benefit obtained by Alon as a direct result of its trespass. The court therefore declines to reduce or eliminate the jury's award of benefits obtained on this basis.

        2.       <u>Whether the Jury's Verdict Evinces Confusion on the Law and an Improper Compromise Verdict</u>

Alon next argues that a new trial is warranted because the verdict returned by the jury evinces confusion on the relevant legal theories. Because the jury initially did not follow the directives on the verdict form they were provided, Alon contends that the verdict is fatally flawed.

The verdict form began with a special interrogatory, which asked whether plaintiffs were bona fide purchasers of the property as against Shell and Alon. (Doc. No. 227 at 1.) The jury answered in the affirmative as to both defendants. (*Id.*) The form then directed that if the jury answered yes to that special interrogatory, they were to skip all questions related to breach of contract and proceed directly to plaintiffs' trespass claim. (*Id.*) Nonetheless, the jury initially proceeded to answer the breach of contract claim questions, finding both Shell and Alon liable as to that claim and awarding breach of contract damages in the amount of $670,824.00 against each of them. (*Id.* at 2–3.) Upon being presented the verdict and reviewing it, the court concluded that as filled out initially by the jury, it was inconsistent with that form's instructions. Accordingly, after consulting with counsel, the court read the relevant directions from the verdict form to the jury in open court, and returned the form to them in light of those directions. (Doc. No. 242 at 37–38.) The jury subsequently returned a verdict finding Alon and Shell liable for trespass and awarded damages accordingly but, consistent with the verdict form's directions, made no finding

of liability on plaintiffs' breach of contract claim. In doing so, the jury reallocated the $670,824.00 in damages from the breach of contract to trespass on the verdict form.

As a general rule, "a court has a duty under the Seventh Amendment to harmonize a jury's seemingly inconsistent answers if a fair reading allows for it." *Bains LLC v. Arco Prods. Co., Div. of Atl. Richfield Co.*, 405 F.3d 764, 771 (9th Cir. 2005). However, that rule is inapplicable where, as here, a jury renders a finding that is flatly inconsistent with the verdict form's directions. "[S]pecial findings issued in violation of the trial court's express instructions do not constitute legitimate or viable findings of fact. The trial court must therefore dismiss them as surplusage, as a matter of law." *Floyd v. Laws*, 929 F.2d 1390, 1397 (9th Cir. 1991). When a jury renders an inconsistent verdict, and when that inconsistency is recognized prior to the jury's discharge, the district court possesses the discretion to resubmit the verdict form to the jury for reconsideration and further deliberation. *Duk v. MGM Grand Hotel, Inc.*, 320 F.3d 1052, 1057 (9th Cir. 2003), *as amended on denial of reh'g* (Apr. 17, 2003).

Alon now argues that even the amended verdict form must be disregarded to some degree because the jury's findings are contrary to the court's instructions. Specifically, Alon contends that the jury was not permitted to award trespass damages for consequential damages, but was limited only to awarding benefits obtained. An examination of the relevant jury instructions confirms this. The relevant instruction for breach of contract damages was instruction 20, which stated that contract damages could be awarded "to put plaintiffs in as good a position as they would have been if the defendant had performed as promised." (Doc. No. 221 at 22.) Plaintiffs sought breach of contract damages for loss of profits, professional and engineering fees, and the lost value of money. On the original verdict form, the jury awarded a total of $1,341,648.00 in breach of contract damages, split evenly between Shell and Alon. (*Id.*) After the court drew the jury's attention to the language in the verdict form indicating that they were not to answer the breach of contract questions if they found plaintiffs were bona fide purchasers of the property, the jury essentially moved the breach of contract damages over to trespass damages. Thus, in the amended verdict form the jury awarded $33,230,768.00 in benefits obtained by Shell and

/////

10

$6,058,384.00 in benefits obtained against Alon, plus an additional $670,824.00 in trespass damages against each.

The court finds it significant that in his closing argument, plaintiffs' counsel stated to the jury that $1,341,648.00 was the value of the lost Townsend Industries sale. Accordingly, the most reasonable interpretation of the verdict is that the jury intended to compensate plaintiffs for the value of this lost sale. The difficulty is that while instruction 20 contemplated such an award under a breach of contract theory, the corresponding instruction for trespass did not. Rather, instruction 25 informed the jury that in order to recover damages for trespass, "plaintiffs must prove the reasonable cost to rent similar property . . . or the benefits obtained by defendants because of their wrongful occupation. If there is evidence of both, plaintiffs are entitled to the greater of the two amounts." (*Id.* at 27.) The jury duly awarded benefits obtained, but in keeping with instruction 25, they could award no more than that. Because the jury failed to adhere to that instruction, any damages awarded for trespass above and beyond the benefits obtained by defendants must be stricken by the court. *See Floyd*, 929 F.2d at 1397.

At the hearing on the pending motions, plaintiffs argued that the verdict should not be reduced because damages for lost profits are available in trespass actions notwithstanding the language of the jury instructions. Plaintiffs may or may not be correct that lost profit damages are available to the injured party in a trespass action under California law. However, that is beside the point in this action. The fact remains that the jury's award of trespass damages was rendered in contravention of this court's jury instructions. If plaintiffs believed those jury instructions to be erroneous, they should have filed timely objections to them. The record reveals that plaintiffs did not object to any of the jury instructions including this one, jury instruction 25. (Doc. No. 241 at 37.) Moreover, plaintiffs did not propose a jury instruction that provided the award of lost profits as to their cause of action for trespass. Under these circumstances, because the award of

/////

/////

/////

/////

1  trespass damages was contrary to jury instruction 25, the court will reduce the judgments against

2  Shell and Alon by $670,824.00 each.[4]

3       3.     <u>Whether Plaintiffs Failed to Prove They Were Bona Fide Purchasers</u>

4       Next, Alon argues that the jury's finding that plaintiffs were bona fide purchasers of the

5  property was legally erroneous or, at the least, contrary to the weight of the evidence.

6       In this regard, Alon first argues that the jury's finding that plaintiffs lacked notice of

7  Alon's easement was simply incorrect as a factual matter. In order to find that plaintiffs were

8  bona fide purchasers of the property, the court instructed the jury that it had to find that plaintiffs

9  took title without prior actual or constructive notice of the Alon and Shell easements. (Doc. No.

10  224 at 18.) In determining whether plaintiffs had constructive notice of the easements, the jury

11  was further instructed that it "must decide whether, under all the circumstances, the easements

12  had existed for such a period of time and were of such an obvious nature that the plaintiffs, in the

13  exercise of due care, should have discovered them." (*Id.*) To be sure, there was conflicting

14  evidence on this point presented at trial, and counsel on both sides argued to the jury at length as

15  to whether plaintiffs were or were not on constructive notice of those easements. Resolution of

16  this issue is, in the court's view, a quintessentially factual determination, and the court is not

17  permitted to disturb the jury's factual finding unless it was against the weight of the evidence.

18  *See Johnson v. Cella*, 122 Cal. App. 2d 72, 75 (1953) (noting that the issue of constructive notice

19  involved "a conflict in the evidence to be resolved by the trier of facts").

20       Here, the court has no difficulty in concluding that the jury's verdict, in which it found

21  that plaintiffs were bona fide purchasers of the property, was adequately supported by the

22  evidence admitted at trial. Alon's argument that plaintiffs "saw pipeline markers on and near the

23  property during the due diligence period" may be a technically accurate description, but it

24  obscures the evidence as it was actually presented at trial. (Doc. No. 250 at 16.) According to the

25  witnesses, there were indeed pipeline markers on the property at the time of plaintiff's purchase,

26

27    [4] Because the court finds that the trespass damages must be stricken in their entirety, it need not
address defendants' alternative argument that the trespass damages must be offset against the

28  amounts obtained by plaintiffs as a result of their settlement with Chevron U.S.A..

12

but the undisputed evidence at trial established that none of those markers belonged to Alon. Thus, when asked by plaintiffs' counsel at trial whether there was an Alon pipeline marker on the subject property in 2013, Alon's witness Mark Denis responded "no." (Doc. No. 240 at 160.) On this basis, as well as the other evidence presented addressing this dispute, the jury could easily have found that plaintiffs were not on constructive notice of Alon's easement.

Alon is correct that according to the evidence at trial it did have other pipeline markers beyond the boundaries of the property that might have indicated the existence of an easement. However, Alon provides no support for the proposition that a landowner is under a legal duty to inspect property that is not his own in order to ascertain the existence of a servitude across his own land. The most that Alon offered at trial was the testimony of some of its witnesses that, on the basis of industry "custom," the existence of nearby pipeline markers should have caused plaintiffs to undertake a more thorough investigation to learn of Alon's easement. For instance, Mr. Stutzmann testified that "typically, when you would see pipeline markers, you would do some due diligence to figure out what those pipelines were related to." (Doc. No. 236 at 127.) Evidently, the jury found this explanation to be unsatisfactory and rejected it. The jury likely concluded that because those pipeline markers were not physically located on plaintiffs' property, they were not sufficiently obvious to put plaintiffs on notice of Alon's unrecorded easement across their property.

Further, and as discussed in more detail below, the jury instructions directed the jury to make a finding as to whether plaintiffs had notice of the *easements*, not the pipelines. Although the pipelines were contained within easements, the two are distinct. Even if the jury found that plaintiffs were aware of the existence of pipelines on their property, it does not necessarily follow that they should have been aware of the easements. Once again, this matter was argued at length before the jury, and the jury evidently found plaintiffs' arguments regarding the evidence to be more persuasive. The court finds no basis to disturb that finding.

Next, Alon argues that plaintiffs failed to present any evidence that plaintiffs JEC Panama and Wings Way purchased the property, and also that plaintiffs failed to present any evidence that they recorded the deed for the property. Because evidence on both points is necessary to support

a finding that plaintiffs were bona fide purchasers, and because no evidence as to either was presented at trial, Alon contends that judgment as a matter of law is required. (Doc. No. 250 at 16–17.)

Unlike the previous argument related to adequate notice, which both Shell and Alon raised at the close of plaintiffs' case and again at the close of all the evidence, arguments regarding adequate consideration and recordation of the property deed were not raised by the defendants in any way at trial. As noted already, "a proper post-verdict Rule 50(b) motion is limited to the grounds asserted in the pre-deliberation Rule 50(a) motion." *Go Daddy Software*, 581 F.3d at 961; *see also Freund*, 347 F.3d at 761. This requirement is to be strictly construed. *See Tortu v. Las Vegas Metro. Police Dep't*, 556 F.3d 1075, 1082 (9th Cir. 2009); *Janes v. Wal-Mart Stores Inc.*, 279 F.3d 883, 887 (9th Cir. 2002) (noting that "substantial compliance [with Rule 50] is not enough"). This is not a case in which the arguments were "ambiguous or inartfully made[.]" *Reeves*, 881 F.2d at 1498. Rather, the trial transcript demonstrates that these issues were not raised by defendants in any way whatsoever. Because this issue is being raised by defendants now for the first time, review is necessarily deferential: the court is "'limited to reviewing the jury's verdict for plain error, and should reverse only if such plain error would result in a manifest miscarriage of justice.'" *Go Daddy Software*, 581 F.3d at 961 (quoting *Janes*, 279 F.3d at 888). Although Alon advanced other arguments as to why judgment in its favor was proper as to plaintiffs' trespass claim, it made no mention of the lack of recordation or consideration. Its attempts to do so now are unavailing unless it can demonstrate manifest injustice.

The court easily concludes that no manifest injustice has occurred. Even if Alon is correct that no evidence was presented on either element at trial (and the court makes no such finding here), this almost certainly was due to a mere oversight by plaintiffs. Throughout the trial, there was essentially no discussion of recordation or consideration because those points were effectively uncontested. Instead, the real point of dispute was whether plaintiffs had adequate notice of the easements, as discussed above. To the extent Alon believed that evidence on the other elements was lacking, it could and should have raised this argument at trial and allowed

*/////*

14

plaintiffs to remedy this defect.[5]  *See Freund*, 347 F.3d at 761 (noting that the purpose of Rule 50's requirement that a motion be made during trial is to "call[] to the court's and the parties' attention any alleged deficiencies in the evidence at a time when the opposing party still has an opportunity to correct them").

The court has no reason to suppose that Alon and its attorneys have operated in bad faith by lying in wait and springing this argument on plaintiffs and the court now that an adverse verdict has been rendered.  Rather, in the heat of trial, litigants often lose sight of the forest as they do battle over each individual tree.  With hindsight—and, likely, with new attorneys providing a fresh set of eyes—it is often easy to identify new arguments that could have been advanced at trial.  However, Rule 50 does not permit the court to revisit newly-raised arguments unless it is persuaded that a fundamental miscarriage of justice has occurred.  Because the court concludes that no such finding is appropriately made here, it declines to grant judgment or a new trial on this basis.

4.     Whether the Court Erred in Instructing the Jury Regarding Plaintiffs' Notice of the Easements

Next, Alon takes issue with one of the instructions given to the jury.  Final instruction 16 instructed that to be found to be bona fide purchasers of the property, plaintiffs were required to prove that they took title to the property "without prior actual or constructive notice of the Alon and Shell *easements*."  (Doc. No. 221 at 18 (emphasis added).)  Alon contends that this instruction was in error, and that it should have stated that plaintiffs were required to prove that they took title to the property "without prior actual or constructive notice of the Alon and Shell *pipelines*."

Both defendants timely objected to this jury instruction, and the court carefully considered their objections.  Nonetheless, the court adheres to its view that California law focuses on whether

---

[5]  Plaintiffs would have had little difficulty in satisfying these elements, which is precisely why the court finds no manifest miscarriage of justice.  For instance, with their brief in opposition to the pending motion plaintiffs have now submitted a copy of the grant deed of the property.  (Doc. No. 273-5 at 8–10.)  Alon does not argue that this grant deed is insufficient to establish recordation, only that it was not presented at trial to the jury in a proper form.

a purchaser had timely notice of the easement itself, not the physical object that happens to run along the easement. As such, the instruction was proper as given. "The elements of bona fide purchase are payment of value, in good faith, and *without actual or constructive notice of another's rights*." *Melendrez v. D & I Inv., Inc.*, 127 Cal. App. 4th 1238, 1251 (2005) (emphasis added); *Gates Rubber Co. v. Ulman*, 214 Cal. App. 3d 356, 364 (1989).[6] The "rights" in this case are, of course, the easement contracts, which if properly recorded would have given Alon and Shell the right to maintain and operate pipelines on plaintiffs' property. *See* Black's Law Dictionary (11th ed. 2019) (defining an easement as "[a]n interest in land owned by another person, consisting in the right to use or control the land, or an area above or below it, for a specific limited purpose"). Thus, the instructions charged the jury with determining whether plaintiffs were on notice of defendants' legal right to maintain and operate pipelines across the property, an inquiry distinct from the question of whether plaintiffs were on notice of the pipelines themselves. Certainly, defendants were free to argue to the jury that the various pipeline markers put plaintiffs on notice of the existence of underground pipelines, and that the presence of those pipelines, in turn, put plaintiffs on notice of the existence of an easement. That the jury ultimately rejected this argument goes only to the strength of defendants' case, not to the adequacy of the jury instructions. The jury was correctly instructed on the law. Defendants are not entitled to a new trial on this basis.

Finally, the court will respond to an argument advanced by Alon's counsel at the hearing on the pending motions. At oral argument, Alon's attorney pointed out that the use of markers to indicate the presence of underground pipelines has been an oil industry practice for decades, and cautioned that if the verdict in this case is upheld it could cause a sea change in the industry as to

---

[6] California law on this point has been well-established for quite some time. *See Rubio Canon Land & Water Ass'n v. Everett*, 154 Cal. 29, 35 (1908) (finding that plaintiff was put on inquiry sufficient to charge him "with notice of the easement"); *Pell v. McElroy*, 36 Cal. 268, 277 (1868) ("[W]hen a purchaser has knowledge of any fact sufficient to put him on inquiry as to the *existence of some right or title* in conflict with that he is about to purchase, he is presumed to have made the inquiry and ascertained the extent of *such prior right*, or to have been guilty of a degree of negligence equally fatal to his claim to be considered as a *bona fide* purchaser.") (some emphasis added).

that custom.  The court acknowledges this concern but finds it to be greatly overstated in this case.  First, and as already noted, the evidence presented at trial established that Alon had no pipelines markers on plaintiffs' property.  Under these circumstances, the jury was entitled to find that other markers located off of the subject property would not have put a reasonable person on notice of the unrecorded easements.  Second, while an industry custom is relevant to questions of due care, it is not dispositive under California law.  *See Howard v. Omni Hotels Mgmt. Corp.*, 203 Cal. App. 4th 403, 421 (2012) ("In negligence and due care determinations, a manufacturer's compliance with regulations, directives or trade custom does not necessarily eliminate negligence but instead simply constitutes evidence for jury consideration with other facts and circumstances.") (internal quotation marks and brackets omitted); *Holt v. Dep't of Food & Agric.*, 171 Cal. App. 3d 427, 435 (1985) ("Evidence of the custom or general practice in the same trade or occupation is relevant but not conclusive on the question whether the actor utilized due care.").  Alon's witnesses testified at trial about various industry customs, and the jury evidently found their testimony unpersuasive.  Of course, it is sometimes the case that customs themselves are unreasonable.  *See Wolfsen v. Wheeler*, 130 Cal. App. 475, 483 (1933).  For instance, as this trial demonstrated, it has apparently been the practice of several oil and gas companies not to record their easements for underground pipelines.  This requires landowners to conduct their own research as to whether others possess an interest in their property, forcing them to expend additional investigative resources when a simple title search ought to have sufficed.  To the extent the jury's verdict incentivizes these defendants (and others) to promptly record their interests in property, and thereby effect a change in the prevailing industry custom, one could certainly argue that such a change would be for the better.

For the reasons explained above, the court will reduce the judgment against Alon by $670,824.00 and deny Alon's motion in all other respects.

**B.    Shell's Motion for Judgment as a Matter of Law, or in the Alternative for a New Trial (Doc. No. 257)**

The court next addresses Shell's motion for judgment as a matter of law, or in the alternative for a new trial.  (Doc. No. 257.)  To the extent not already raised by Alon and

17

addressed above, the court addresses Shell's arguments in turn below.

1.  <u>Whether Shell Can be Liable for Trespass that Occurred Prior to the Jury Rendering a Verdict</u>

First, Shell argues that as a matter of law, Shell did not commit a trespass until the jury rendered its verdict. Shell's argument proceeds as follows. First, Shell correctly points out that the tort of trespass requires an "unlawful interference" with possession of the property. (*Id.* at 8.) Second, Shell contends that whether its presence on the property was "unlawful" was a question for the jury, since the parties disagreed as to whether Shell had a right to maintain pipelines on plaintiffs' property. (*Id.*) Third, Shell argues that because unlawfulness was not determined until the moment the jury rendered its verdict (by which time Shell had vacated the property), it did not and could not have committed trespass. (*Id.*)

Tellingly, in its reply brief Shell concedes that "there is no case precisely on point" in support of this argument. (Doc. No. 292 at 6.) By itself, this lack of legal support is reason enough to reject Shell's argument, because at this stage Shell bears the burden of demonstrating its entitlement to judgment as a matter of law. *See Jules Jordan Video*, 617 F.3d at 1155 ("A district court can set aside a jury verdict and grant JMOL only if, under governing law, there can be but one reasonable conclusion as to the verdict and only if there is no legally sufficient basis for a reasonable jury to find for that party on that issue."). This lack of authority is, moreover, unsurprising in light of the truly staggering consequences such a rule would have. Were the law in this regard to be as suggested by Shell, an entity wrongfully claiming the right to occupy a piece of property could commit all manner of damage to the land—or, as relevant in this case, use its trespassing access to the land for its own financial reward. Such an entity could proceed to use the property in this manner right up to the moment when a trial is convened and a verdict rendered against it, insulated from liability the entire way. Only then would the wrongdoer be obligated to vacate the land, pocketing any profits realized through its trespass and leaving the rightful landowner to clean up the mess. The law of trespass does not function in this manner.

Language from the California Supreme Court also indicates that Shell's interpretation of the law of trespass is misguided. In *Pettis v. General Telephone Co. of California*, 66 Cal. 2d 503

18

(1967), the California Supreme Court reversed a grant of summary judgment against a plaintiff landowner after finding the existence of a factual dispute as to whether the plaintiff was a bona fide purchaser without prior notice of defendants' claims of right to maintain underground telephone lines. For this alleged trespass, plaintiff sought an injunction requiring removal of those utility lines as well as monetary damages. *Id.* at 505. In reaching its decision, the court noted that if plaintiff were to establish his status as a bona fide purchaser, "then his rights in the land must be deemed superior and prior to those claimed by defendant utility companies and he will be entitled to his remedy." *Id.* at 506–07. The California Supreme Court's statement that the landowner's rights "must be deemed . . . prior to those claimed by defendant" can only be reasonably construed to mean that the easement is deemed void from the time the landowner purchased the property. Under *Pettis*, therefore, an entity such as Shell who occupies land with an unrecorded easement does so at its own peril. The court declines to grant judgment in favor of defendant Shell as a matter of law based upon this basis.

2.      Whether Plaintiffs Had Constructive Notice of Shell's Unrecorded Easement

Next, Shell argues that as a matter of law, plaintiffs were on constructive notice of its unrecorded easement and that, as such, Shell is entitled to judgment as a matter of law.

As has been made abundantly clear throughout these proceedings, a multitude of pipelines lie beneath the surface of the San Joaquin Valley. Some of them run quite close to one another. This proximity is at the heart of the dispute between plaintiffs and Shell. In support of their arguments that plaintiffs were on notice of the relevant easement as a matter of law, Shell points to three pieces of evidence introduced at trial. First is the presence of two pipeline markers, labeled Shell Pipeline Company, which marked the route of the relevant Shell pipeline across the property. (Doc. No. 257 at 11.) Second is the assessment undertaken by Krazan & Associates, who were hired by plaintiffs to conduct an Environmental Site Assessment. (*Id.*) Bill Cooper, a Krazan employee, testified at trial that he assumed that a pipeline ran underground connecting these two markers, and that he informed plaintiffs of this. (Doc. No. 237 at 39.) Finally, Roger McIntosh, who was hired by plaintiffs to prepare a Due Diligence Report, testified at trial that he observed pipeline markers belonging to Chevron, Shell, and Alon. (*Id.* at 63.) Shell argues that

1 based on this evidence admitted at trial, "there can be no doubt that Plaintiffs were *aware*, prior to

2 the close of escrow, that Shell was operating a pipeline running east-west that crossed the

3 frontage of the property." (Doc. No. 257 at 12.)

4 　　　　Shell errs in its argument both legally and factually. Legally, whether plaintiffs were

5 aware of the existence of a particular pipeline was not the ultimate issue to be resolved at the trial

6 of this action. The jury was instructed—correctly in the court's view, for the reasons already

7 discussed above—that in order to find plaintiffs to be bona fide purchasers, the plaintiffs must

8 have been without actual or constructive notice of the easements. The pipelines, while perhaps

9 relevant to that determination, are not dispositive. Factually, plaintiffs proffered a reasonable

10 explanation as to why these pipeline markers did not place them on notice of the relevant

11 unrecorded easement. Quite simply, there were numerous pipelines running on or adjacent to the

12 subject property, some of which were contained in duly recorded easements of which plaintiffs

13 were indisputably on notice. Because there were other, recorded easements nearby, and because

14 there was no evidence that the pipeline markers indicated which easement they belonged to, the

15 jury could easily have found that plaintiffs were not in any way on constructive notice of the

16 defendants' unrecorded easements.

17 　　　　In essence, Shell's argument reduces to a contention that a reasonable person in plaintiffs'

18 position would have done more to ascertain the existence of its unrecorded easement. Thus, at

19 trial Shell's counsel asked Mr. Cooper whether he had ever used the National Mapping Pipeline

20 System in an attempt to find all the pipelines running across the property. (Doc. No. 237 at 40–

21 41.) Mr. Cooper responded that he had not reviewed it in connection with this project. (*Id.* at

22 41.) The apparent implication from Shell's line of questioning was that Mr. Cooper should have

23 done so in the exercise of due care. Another similar example occurred during the cross-

24 examination of Mr. Carver, when Shell's counsel asked him whether he had ever personally

25 attempted to match up the pipeline markers with the easements. (Doc. No. 234 at 154.) Mr.

26 Carver responded that he had not. (*Id.*) Again, the clear import of this line of questioning was

27 that, in Shell's view, a reasonably diligent person should have made such an attempt. In the

28 court's view, however, the evidence in this regard was not overwhelming one way or the other. A

jury receiving that evidence could reasonably have found that under the relevant circumstances, plaintiffs exercised due care in seeking to discover the existence of Shell's unrecorded easement. Finders of fact exist to make such determinations. Shell evidently disagrees with the conclusion reached by this jury, as is its right, but offers no legal basis for this court to overturn the jury's finding. As such, Shell's motion will be denied.

**C.** **Shell's Motion to Amend the Judgment and for a New Trial (Doc. No. 258)**

Next, the court addresses Shell's motion to amend the judgment and for a new trial. (Doc. No. 258.) Shell argues, as did Alon, that the judgment against it should be substantially reduced if not eliminated outright, both as to damages and as to the benefits obtained.[7]

> 1. Whether the Judgment Against Shell for Benefits Obtained Must Be Eliminated
>     Because Shell's Occupation of the Property was Not Wrongful

First, Shell argues that under California Civil Code § 3334, plaintiffs may not recover for benefits obtained as a matter of law.

Shell's argument fails from the outset because it proceeds from a false premise, namely that its trespass was "unintentional or inadvertent." (Doc. No. 258 at 10.) Shell's argument is indistinguishable from Alon's argument that it is entitled to judgment as a matter of law because any trespass was the result only of a mistake of fact. Like Alon, Shell did not plead mistake of fact in its answer, nor did it request a jury instruction to that effect. The time to raise and litigate this issue has long since passed.

As a fallback position, Shell argued at the hearing on the pending motions that despite its failure to plead or prove mistake of fact, the court was nonetheless under an affirmative obligation to include a jury instruction for mistake of fact, and that the failure to do so amounted to reversible error. In other words, Shell contends that a trial court's failure to *sua sponte* instruct the jury on the elements of an unpleaded and unargued affirmative defense amounts to plain error. Shell is mistaken. Indeed, the court finds this argument to be frivolous.

---

[7] Shell's motion incorporates by reference Alon's argument that the judgment should be reduced to account for the jury's improper award of trespass damages. (Doc. No. 258 at 19.) For the reasons already stated, the court will reduce the judgment against Shell by $670,824.00.

2. <u>Whether the Judgment Against Shell for Benefits Obtained Must Be Reduced</u>
<u>Because Shell Did Not Obtain Benefits of $33,230,768.00 by Trespassing on the</u>
<u>Property</u>

Shell next argues that even if an award of benefits obtained to plaintiffs was legally permissible, the amount awarded by the jury was excessive, and must be reduced.

Shell's argument is based upon the decision in *Starrh*, one of the leading cases from the California Court of Appeal discussing an award of benefits obtained under California Civil Code § 3334. The facts of *Starrh* bear some similarity to those in this case and are therefore worth recounting here. The plaintiff in *Starrh* was a landowner farming cotton in western Kern County on property adjacent to Belridge Oil Field, owned by defendant Aera. *Starrh*, 153 Cal. App. 4th at 589. In the process of extracting oil from the ground, Aera produced waste water, which was high in chlorides, boron, and other dissolved solids. *Id.* Aera's practice was to pump this waste water into two unlined ponds, where it sat. *Id.* at 590. Some of this water was lost to evaporation, while the rest of it seeped into the ground, some of which eventually migrated directly underneath the plaintiff's property. *Id.* The evidence established that, even prior to Aera's production of waste water, the water underneath the plaintiff's property was high in salt, making it difficult to use for agriculture, although Aera's disposal of waste water exacerbated that problem. *Id.* at 590–91.

At trial, plaintiff sought an award of benefits obtained by Aera under § 3334, arguing that the defendant's disposal of waste water was a benefit. Evidence established that placing the waste water in ponds cost Aera only 1.5 cents per barrel of water, whereas other methods of disposal would have cost Aera 35 to 76 cents per barrel. *Id.* at 605. The trial court permitted plaintiff to recover benefits obtained under § 3334, but construed that provision narrowly. In particular, the trial court ruled that the benefits obtained "are costs equal to those avoided by the trespasser–nothing more." *Id.* at 602. In doing so, the trial court specifically rejected plaintiff's argument that benefits obtained should also include a trespasser's profits. *Id.* As a result, no evidence of Aera's profits was ever presented to the jury. *Id.* at 589. In reversing this portion of the trial court's opinion, the California Court of Appeal concluded that "the phrase 'benefits

obtained' has a wider scope than that given to it by the trial court here—assuming there is a direct link between the financial benefit and the trespass." *Id.* at 604.

Shell first argues that the Court of Appeal's opinion in *Starrh* "suggested that the 'benefit obtained' under section 3334 would be only the portion of Aera's profits attributable to those avoided costs." (Doc. No. 258 at 14.) To that end, Shell points out that here evidence was presented demonstrating that for $800,000.00, Shell could have rerouted its pipeline across the street, and argues that benefits obtained should be capped at that amount. (*Id.*) As the above discussion indicates, the state appellate court in *Starrh* held precisely the opposite. Contrary to Shell's argument and as that court observed, "[i]f the Legislature had wanted to limit the phrase 'benefits obtained' to costs avoided, it could easily have done so." *Starrh*, 153 Cal. App. 4th at 604. Shell's argument in this regard is meritless.

Next, Shell argues that the vast majority of the benefits obtained in this case were not "directly linked" to Shell's trespass because, of the roughly 450 miles of pipelines in the San Pablo Bay Pipeline System, only 0.23 miles crossed plaintiffs' property. (Doc. No. 258 at 14–15.)

As best the court can discern, Shell is asking this court to impose some manner of *pro rata* calculation of benefits obtained, whereby Shell is obligated to pay benefits obtained to plaintiffs only as a percentage of the pipeline that actually trespassed across plaintiffs' property. Running those calculations in this case shows Shell's proposal to be quite misguided. Plaintiffs' expert calculated Shell's benefits obtained from the San Pablo Bay Pipeline System to be $32,080,126.00 during the relevant time period, and the jury returned an award of benefits obtained against Shell quite close to that amount. Meanwhile, 0.23 miles of pipeline crossed plaintiffs' property out of a total length of 450 miles, or roughly 0.05 percent of the total length of pipeline in the San Pablo Bay Pipeline System. Reducing plaintiffs' benefit obtained accordingly would yield a total benefit obtained of $16,396.50 over the relevant period. Under the circumstances presented in this case, that amount would be a pittance. Far from "eliminat[ing] financial incentives for trespass," *Watson Land Co. v. Shell Oil Co.*, 130 Cal. App. 4th 69, 79 (2005), such an award would affirmatively incentivize tortfeasors such as Shell to continue

23

trespassing because the trespass would be far cheaper than vacating the property. Shell admits in the pending motion that based upon the undisputed evidence at trial, the cost for Shell to reroute its pipeline was $800,000.00. (Doc. No. 258 at 14–15.) If Shell is correct that it is liable for benefits obtained only in proportion to the percentage of pipeline actually crossing plaintiffs' property, the most economically efficient solution would be to simply continue trespassing. Indeed, if these amounts are correct, Shell would come out ahead even if it continued to trespass onto plaintiffs' property for decades into the future. Such an outcome is not in keeping with either the text or legislative history of § 3334, and the court declines to endorse Shell's interpretation of that statute. *See Watson Land Co.*, 130 Cal. App. 4th at 79 (examining the legislative history of § 3334 and concluding that the provision was "intended to eliminate financial incentives for trespass by eradicating the benefit associated with the wrongful use of another's land").

To be sure, the award of benefits obtained under § 3334 is cabined in important respects. The court in *Starrh* noted that "alternative, although more expensive, methods of [waste water] disposal were available to Aera," and that Aera's avoidance of these costs should be considered for purposes of determining the benefit obtained. *Id.* at 605. In addition, a subsequent decision by the California Court of Appeal elaborated on this point in cases where, as here, evidence is presented both as to a trespasser's revenues and to its costs. *Bailey v. Outdoor Media Grp.*, 155 Cal. App. 4th 778 (2007). The state appellate court in *Bailey* held that

> when, as in this case, the defendant presents credible evidence of the expenses it incurred, the trial court may offset those expenses against the gross income generated and award the profit as the benefit obtained under section 3334. Conversely, when the trespassing defendant does not present such evidence, a trial court may award damages based on gross revenue as the benefit obtained by the wrongful occupation of land for the purpose of operating a business.

*Id.* at 788.

Applied here, however, neither of these cases mandates a reduction in the award of benefits obtained to plaintiffs. *Bailey* is inapplicable because in this case, although under no obligation to do so, plaintiffs presented evidence not only of Shell's revenues from its trespass on plaintiffs' property, but also its costs. Relying upon data provided by Shell, plaintiffs' expert

Susan Thompson considered both Shell's revenues and costs before arriving at a "conservative" estimate of roughly $32 million in profits generated by Shell through its trespass during the relevant period. (Doc. No. 238 at 81.) To the extent Shell disagreed with those calculations, it was their burden to introduce evidence rebutting them. Shell simply did not offer any such evidence at trial. Likewise, the opinion in *Starrh* also does not mandate a reduction in the amount of benefits obtained because, as mentioned, Shell was permitted to introduce evidence "that alternative, although more expensive, methods of" transporting petroleum were available to it, and was then also permitted to argue to the jury that any award of benefits obtained should account for those alternatives. *Starrh*, 153 Cal. App. 4th at 605. The jury evidently found this evidence and argument presented by Shell to be unconvincing. The court certainly does not read the decision in *Starrh* as requiring it to substitute its own judgment as to whether the jury struck the appropriate balance between the profits made by Shell and more expensive alternative actions it could have taken. Rather, the only role for this court (as envisioned by the court in *Starrh* in modifying that award) is to determine whether the benefits obtained are "directly linked to the wrongful trespass." *Id.* at 606. Here, the link between the trespass and Shell's profit is so obvious it need hardly be stated: Shell, a major energy company, transported oil it intended to sell across plaintiffs' property without permission, and ultimately made a great deal of money from doing so. The court rejects Shell's argument that the benefits obtained by it as a result of its actions in this case are too attenuated from the trespass such that the court should modify the verdict.

At oral argument on the pending motions, Shell appears to have recalibrated its argument to some degree. Apparently, Shell now suggests that costs avoided should act as a floor for the award of benefits obtained rather than a ceiling, as was argued unsuccessfully by the defendant in *Starrh*. Although benefits obtained can be awarded above and beyond costs avoided, Shell argues that there must be some degree of proportionality between them, and that the amount of costs avoided should serve as a "guidepost" in any award of benefits obtained.

The precise contours of Shell's argument are rather murky, primarily because the argument is unsupported by existing caselaw. This argument now advanced by Shell is also

based on a misreading of the decision in *Starrh*. That case held that in the context of restoration damages awarded for trespass, there must be a "reasonable relationship" between the cost of restoring the property and the harm caused by trespass. *Id.* at 601. However, the only "restoration damages" at issue in this case related to Shell is the $800,000.00 cost associated with the removal of the trespassing pipeline from plaintiffs' property and the restoring of the property to its condition prior to the trespass. The court does not conclude that the $800,000.00 cost is unreasonable under the facts of this case. By way of comparison, the amount of restoration costs in *Starrh* was estimated at $2 billion, several orders of magnitude greater than the amounts at issue here. *Id.*

In addition, restoration damages are analytically distinct from the benefits obtained under the circumstances of this case. The facts in *Watson* illustrate this point well. There, Shell once more found itself defending against a trespass action resulting from an underground pipeline. *Watson Land Co.*, 130 Cal. App. 4th at 71. Once more, the jury found Shell to be trespassing on the plaintiff's land, and once more a judgment was entered in the plaintiff's favor based in large part on Shell's benefits obtained under § 3334. *Id.* Unlike this case, however, the benefits obtained in *Watson* were not tethered to the profits Shell ultimately obtained from the oil transported through the pipeline. At least some of that oil never made it to the refinery, instead leaking out of the pipeline and contaminating the soil and groundwater. *Id.* The jury found that Shell derived a $14,275,237.00 "benefit" by failing to clean up this contamination, but the California Court of Appeal disagreed. The state appellate court agreed with Shell under those circumstances and held that the failure to clean up contamination was not a benefit because the leakage of oil onto the plaintiff's property was not itself "advantageous for Shell." *Id.* at 77. If anything, the court concluded, it was the opposite: "not only did the gasoline leakage result in a loss of product for Shell, but it meant that pipelines either had to be repaired or abandoned and replaced by different pipelines at substantial cost." *Id.* Shell's new argument fails in this case for the same reason it succeeded in *Watson*: while a polluter garners no direct benefit from the fact of its pollution, a trespassing oil company garners a great deal of benefit when it profits from the sale of its oil.

Moreover, Shell's proposed methodology is antithetical to the purpose of the statute, which is to "eliminate *any* economic incentive to trespass as a means of waste disposal." *Starrh*, 153 Cal. App. 4th at 604. Basic mathematical calculations demonstrate that Shell's approach is deeply flawed. At oral argument, Shell suggested that benefits obtained should properly be calculated only as a ratio of the amount of costs avoided.[8] Specifically, counsel for Shell randomly proposed that the total amount of benefits should equate to no more than twice the amount of costs avoided. Shell then pointed to evidence establishing that it avoided costs of $800,000.00 by not relocating its pipeline, meaning that benefits obtained under § 3334 would be capped at $1,600,000.00. Because the jury in fact found that Shell obtained benefits in the amount of $33,230,768.00, Shell's proposed rule would result in it enjoying windfall profits to the tune of $31,630,768.00. Far from disincentivizing trespass, Shell's randomly proposed rule would appear to make trespassing quite lucrative. Indeed, the cheaper the avoidance costs, the greater the incentive to trespass. Suppose that instead of relocating the pipeline for $800,000.00, Shell could instead have utilized an alternative pipeline at a cost of $204,000.00, as was the case with Alon. Under this hypothetical, and applying the same ratio set out above, the award to plaintiffs of benefits obtained would then be capped at only $408,000.00, leaving Shell with over $32.8 million in windfall profits. If Shell's rule were to be adopted, the smart trespasser would rack up as much in profits as possible, safe in the knowledge that most of those profits would be beyond the reach of California law. There is no reason to suppose that the California Legislature did endorse, or would have endorsed, such a perverse outcome in enacting § 3334.[9]

[8] This ratio-driven method of analysis appears to have been derived by Shell from the law of punitive damages. A common method of determining whether a particular award of punitive damages comports with the Due Process Clause is to look at the ratio between punitive damages and compensatory damages. Although declining to impose a bright-line rule, the Supreme Court has noted that "in practice, few awards exceeding a single-digit ratio between punitive and compensatory damages, to a significant degree, will satisfy due process." *State Farm Mut. Auto. Ins. v. Campbell*, 538 U.S. 408, 425 (2003).

[9] In fairness, it is fair to say that the jury's verdict in this case does provide a substantial windfall to plaintiffs. The total dollar amount awarded to plaintiffs is far in excess of the amount they paid for the property, and is also well beyond even the most aggressive estimations of damages actually suffered by them. However, this windfall is the natural and predictable consequence of the California Legislature's enactment of § 3334.

Shell also now takes issue with the methodology employed by plaintiffs' expert Susan Thompson.  Shell argues that Ms. Thompson's calculation of Shell's profits that was presented at trial was improper because those calculations inappropriately limited the measure of costs, resulting in an inflated calculation of Shell's profit.  (Doc. No. 258 at 16–17.)

Ms. Thompson was qualified to testify based upon her expertise as a CPA, and her expert report was admitted into evidence by stipulation of the parties.  As with the other experts who testified in this case, her testimony was permitted because it was the "product of reliable principles and methods."  Fed. R. Evid. 702(c); *see also Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 595 (1993).  In arguing that Ms. Thompson's conclusions were the product of "flawed methodology" (Doc. No. 258 at 17), Shell is in effect mounting an after-the-fact *Daubert* challenge to that testimony.  As is the case with many of defendants' arguments now being presented to the court, this argument has been waived.  "Failure to raise a *Daubert* challenge at trial causes a party to waive the right to raise objections to the substance of expert testimony post-trial."  *Skydive Ariz., Inc. v. Quattrocchi*, 673 F.3d 1105, 1113 (9th Cir. 2012).  Shell's belated challenge to plaintiffs' expert testimony must be rejected.

At bottom, Shell's many arguments are all lawyerly variations on the same theme:  that given the length of time during which the trespass occurred, the cost of removing the pipeline, and the fact that the actual damages to plaintiffs are relatively modest, the jury's award against Shell is simply too high under the circumstances.  Shell's concern is not a new one.  As pointed out in a footnote in plaintiffs' opposition to Shell's motion for judgment as a matter of law, the prospect of large verdicts being rendered against oil and gas companies resulting from cases seeking benefits obtained was raised prior to the passage of the most recent version of § 3334.  (*See* Doc. No. 288 at 13 n.3.)  Texaco—which, as it happens, was originally a party to the easements in this case—warned the California Legislature that "[p]ermitting recovery of the benefits of wrongful occupation could expose [oil and gas interests] to suit seeking recovery of the full value of oil and gas produced from a parcel of property."  (*Id.*)  The California Legislature proceeded to enact the statute despite these expressed concerns, strongly suggesting that it was not particularly bothered by them.  Benefits obtained are not a punishment, but rather a

mechanism to ensure that trespassers do not stand to gain from their trespass.  *See Watson Land Co.*, 130 Cal. App. 4th at 79 (noting that § 3334 was passed to combat instances in which "trespassers find it to their advantage to intentionally use another's land, reap large benefits for that act, and then pay a relatively small amount of damages for the trespass").  The jury's verdict in this case requires Shell to pay plaintiffs only what it has already received.  To the extent that results in a large monetary judgment against it, that is a function solely of Shell's high profits realized as a result of its trespass as determined by the jury.

In sum, while the court will amend the judgment to account for plaintiffs' settlement with Chevron, and will reduce the compensatory damages award by $670,824.00, Shell's motion will be denied in all other respects.

**D.      Plaintiffs' Motion for Attorneys' Fees (Doc. No. 265)**

Next, the court turns to plaintiffs' motion for attorneys' fees.  (Doc. No. 265.)  Plaintiffs collectively request a total fees award of $1,266,470.00.  Shell and Alon raise numerous arguments as to why plaintiffs are not entitled to such fees, which are addressed in turn.

1.      <u>Whether Plaintiffs Have Standing to Enforce the Attorneys' Fee Provision</u>

First, Alon argues that plaintiffs lack standing to enforce any terms of the easement contract, including the provision providing for attorneys' fees, because plaintiffs were not a party to the contract.  (Doc. No. 283 at 9.)  Alon is incorrect in this regard.  Although the contract was originally entered into by Chevron U.S.A. Inc. and Texaco Exploration and Production Inc. (Doc. No. 265-1 at 295), the contract states that "the terms and conditions of this agreement shall inure to the benefit of and be binding upon the successors and assigns of the parties hereto."  (*Id.* at 297.)  Plaintiffs, as the successors of Chevron, are plainly entitled to enforce the easement contract.

2.      <u>Whether the Terms of the Easement Contract Provide for Attorneys' Fees Under These Circumstances</u>

Next, both Shell and Alon argue that even if plaintiffs have standing to enforce the contract, plaintiffs are not entitled to attorneys' fees because of the particular language of the easement contracts.  (*Id.* at 10–12; Doc. No. 279 at 8–11.)

The relevant fees provision with the easement contract provides that:

> Upon the termination of the rights herein given, Grantee shall at its own risk and expense remove all pipe and any other property placed by or for Grantee upon said premises hereunder and restore said premises as nearly as possible to the same state and condition it was in prior to any construction of said pipe line, but if it should fail to do so within sixty (60) days after such termination, Grantor may so do at the risk of Grantee, and all cost and expense of such removal and the restoration of said premises as aforesaid, together with interest thereof at the rate of ten percent per annum, shall be paid by Grantee upon demand; and in case of a suit to enforce or collect the same, Grantee agrees to pay Grantor in addition a reasonable attorney's fee to be fixed and allowed by the court.

(Doc. No. 265-1 at 296.) Thus, Shell argues, an award of attorneys' fees to plaintiffs would be appropriate only if:

> (i) Plaintiffs were parties to the easement agreement; (ii) the easement was terminated pursuant to the terms of the easement agreement, (iii) Shell failed to remove all pipe from the premises within 60 days of the termination, (iv) Plaintiffs undertook the removal of the pipe themselves, (v) upon completion of the removal, Plaintiffs demanded reimbursement from Shell and Shell failed to pay, (vi) Plaintiffs filed an action against Shell to collect the unpaid costs and expense of the pipe removal, and (vii) Plaintiff prevailed in that action.

(Doc. No. 279 at 9–10.) As Shell points out, under this reading, the attorneys' fee provision is inapplicable here because plaintiffs did not actually remove the pipelines.

Plaintiffs do not contest this interpretation of the contract in their reply. (*See* Doc. No. 296 at 9–10.) Instead, they contend that by operation of California Civil Code § 1717(a), this "narrow" attorneys' fee provision is in actuality broader than it reads on its face. That statute states that "[w]here a contract provides for attorney's fees . . . that provision shall be construed as applying to the entire contract, unless each party was represented by counsel in the negotiation and execution of the contract, and the fact of that representation is specified in the contract." Cal. Civ. Code § 1717(a). This particular provision was added to § 1717 in response to the California Court of Appeal's decision in *Sciarrotta v. Teaford Custom Remodeling, Inc.*, 110 Cal. App. 3d 444 (1980). *See Sears v. Baccaglio*, 60 Cal. App. 4th 1136, 1147 (1998) (noting that § 1717 was "broadened in 1983 by Senate Bill 886" and that "the express purpose of Senate Bill 886 was to overturn the appellate opinion in *Sciarrotta*"). In *Sciarrotta*, the defendant had agreed to

30

construct a house on plaintiffs' property in exchange for a monetary sum. *Sciarrotta*, 110 Cal. App. 3d at 446. After the house was built and plaintiffs moved in, plaintiffs discovered numerous defects with the house and sued for breach of contract, arguing that the defendant had breached his contractual obligation to construct a house in a "good and workmanlike manner." *Id.* Although defendant agreed to pay plaintiffs damages, the question of attorneys' fees was unresolved. Under the contract between the parties, attorneys' fees and costs were only available in an action on the "contract price." *Id.* Noting that "[t]he language of the contract clearly appeared to limit the owner's potential damages for attorney's fees only to suits over payment of the contract price," the court declined to award attorneys' fees under § 1717 because the attorneys' fee provision in the contract did not by its terms cover plaintiffs' claim. *Id.*

Thus, under California law today, a contract provision confining the award of attorneys' fees to particular causes of action or theories of recovery is ineffective unless each party was represented by counsel in the negotiation and execution of the contract, and such representation is explicitly set forth in the contract. Because the court finds no language to that effect in the easement contract at issue here, the court is not persuaded by defendants' arguments that attorneys' fees are *per se* unavailable.

Defendants next argue that attorneys' fees are unavailable because the cause of action on which plaintiffs ultimately prevailed was for trespass, not breach of contract. As a result, this action is not "on a contract" for purposes of § 1717. Although the boundaries of whether an action is "on a contract" have proven to be somewhat uncertain, various panels of the California Court of Appeals have produced the following applicable definition:

> An action (or cause of action) is 'on a contract' for purposes of section 1717 if (1) the action (or cause of action) 'involves' an agreement, in the sense that the action (or cause of action) arises out of, is based upon, or relates to an agreement by seeking to define or interpret its terms or to determine or enforce a party's rights or duties under the agreement, and (2) the agreement contains an attorney fees clause.

*Eden Twp. Healthcare Dist. v. Eden Med. Ctr.*, 220 Cal. App. 4th 418, 427 (2013) (quoting *Douglas E. Barnhart, Inc. v. CMC Fabricators, Inc.*, 211 Cal. App. 4th 230, 242 (2012)).

/////

As this definition indicates, the term "on a contract" is to be construed liberally. *See Turner v. Schultz*, 175 Cal. App. 4th 974, 979 (2009). Applying it to the facts of this case, the court has little difficulty in concluding that plaintiffs' cause of action for trespass was "on a contract" within the meaning of California law. Although a trespass action is of course not an action for breach of contract, plaintiffs' particular theory of trespass in this case was intimately tied to the easement contracts. In order to prevail on it, plaintiffs were required to prove that the easement contracts were invalid because they purchased the property without notice of them, and were therefore bona fide purchasers. *See Hsu v. Abbara*, 9 Cal. 4th 863, 870 (1995) ("It is now settled that a party is entitled to attorney fees under section 1717 even when the party prevails on grounds the contract is inapplicable, invalid, unenforceable or nonexistent."). This trespass action undoubtedly "involved" a contract. The second prong identified above is also satisfied because the agreement plainly contained an attorneys' fee provision.

Nor is the court persuaded by defendants' argument that plaintiffs may not collect attorneys' fees by virtue of the California Supreme Court's holding in *Mountain Air Enterprises, LLC v. Sundowner Towers, LLC*, 3 Cal. 5th 744 (2017) [hereinafter *Mountain Air*]. That case concerned a complex real estate transaction gone awry, after which the plaintiff brought an action seeking to compel the defendant to repurchase property. *Mountain Air*, 3 Cal. 5th at 748–49. Defendants prevailed at trial and thereafter filed a motion for attorneys' fees, seeking an award of fees under both the "repurchase agreement" and the "option agreement" entered into between the parties. That case, however, dealt with the entitlement to attorneys' fees under California Civil Procedure Code § 1021, and did not confront the question now before this court of whether an attorneys' fee provision which was narrow on its face nonetheless applied to the entire contract by operation of § 1717. A California Court of Appeal case issued after *Mountain Air* confirmed that, under the circumstances present in this case, such a provision must be read to apply to the entire contract. In *R.W.L. Enterprises v. Oldcastle, Inc.*, 17 Cal. App. 5th 1019 (2017), the relevant fee provision stated that "[s]hould SELLER be required to initiate any legal action or proceeding to enforce payment under this CONTRACT, or to recover damages for the breach thereof, PURCHASER agrees to pay court costs and reasonable attorney's fees incurred by SELLER."

*R.W.L. Enters.*, 17 Cal. App. 5th at 1026.  The state appellate court  noted that application of

§ 1717 modified this provision in two respects.  First, despite the language allowing attorneys'

fees only for actions initiated by the seller, § 1717 "extends the right to both parties irrespective

of who filed suit."  *Id.*  Second, despite the language limiting attorneys' fees to actions to enforce

payment or to recover damages for breach of contract, § 1717 "extends attorney fee provisions to

the entire contract."  *Id.* at 1027 (internal quotation marks omitted).  That analysis applies in full

here.

      In sum, the court finds that under California Civil Code § 1717 plaintiffs are entitled to the

award of attorneys' fees here.

      3.    <u>Whether the Hourly Rates Requested for This Case Are Reasonable</u>

      Both Shell and Alon argue that the attorney's fee amount requested by plaintiffs is too

high.  In assessing fee applications, the reasonable hourly rates are calculated according to the

prevailing market rates in the relevant legal community.  *Blum v. Stenson*, 465 U.S. 886, 895

(1984); *Gonzalez v. City of Maywood*, 729 F.3d 1196, 1205 (9th Cir. 2013); *Ingram v. Oroudjian*,

647 F.3d 925, 928 (9th Cir. 2011) ("We have held that '[i]n determining a reasonable hourly rate,

the district court should be guided by the rate prevailing in the community for similar work

performed by attorneys of comparable skill, experience, and reputation.'") (quoting *Chalmers v.

City of Los Angeles*, 796 F.2d 1205, 1210–11 (9th Cir. 1986)); *Van Skike v. Dir., Office of

Workers' Comp. Programs*, 557 F.3d 1041, 1046 (9th Cir. 2009).[10]  Typically, the "relevant legal

/////

/////

---

[10]  The parties have addressed the appropriate hourly rates to be awarded in this case under federal law.  However, because this action is before this federal court based solely on diversity jurisdiction and involves only causes of action brought under California law, application of federal law to this question may be inappropriate.  *See Sekula v. FCA US LLC*, No. 1:17-cv-00460-DAD-JLT, 2019 WL 5290903, at *5 & n. 3 (E.D. Cal. Oct. 18, 2019) ("California courts . . . focus on the reasonable hourly rate for the work performed by the counsel performing that work, regardless of the forum in which that work was performed and without regard to typical hourly rates in the forum in which the matter was litigated.")  Because it appears that the attorney's fees award in this case would be unaffected by application of California law, the court will follow the parties' lead and address the appropriate hourly rates under federal standards governing that determination.

community" is the forum district[11] and the local hourly rates for similar work should normally be employed. *Gonzalez*, 729 F.3d at 1205; *Prison Legal News*, 608 F.3d at 454; *Gates v. Rowland*, 39 F.3d 1439, 1449 (9th Cir. 1994); *Deukmejian*, 987 F.2d at 1405

Plaintiffs request rates for their attorneys and paralegals at the following rates:

| **Professional** | **Rate:** |
| --- | --- |
| Attorney Thomas A. Vogele | $650 |
| Attorney Timothy M. Kowal | $650 |
| Attorney Teddy T. Davis | $550 |
| Attorney Brendan M. Loper | $400 |
| Attorney Marisa D. Polis | $400 |
| Paralegal Angela Brown | $150 |
| Paralegal Kerri Summers | $150 |
| Paralegal Michele Pfeiffer | $150 |

---

[11] The court recognizes that judges of the Eastern District of California have often distinguished between the Fresno and Sacramento communities in determining hourly rates. The general rule for awarding attorneys' fee rates, however, is that "the rates of attorneys practicing in the forum *district*" are used. *Gates v. Deukmejian*, 987 F.2d 1392, 1405 (9th Cir. 1992) (emphasis added). The ultimate task of the court is to discern the "prevailing market rates in the relevant community." *See Gonzalez*, 729 F.3d at 1205 (quoting *Dang v. Cross*, 422 F.3d 800, 813 (9th Cir. 2005)). This court has found no authority for the proposition that hourly rates for attorneys in Sacramento may not be used to guide the court's award of such fees in cases originating in Fresno, particularly in specialized fields of litigation. Again, the typical approach looks to the *district* in which the court sits. *See Gonzalez*, 729 F.3d at 1206 (noting the appropriate rate was "the market rate prevailing in the Central District of California"); *Prison Legal News v. Schwarzenegger*, 608 F.3d 446, 455 (9th Cir. 2010) (using the "Northern District of California" as the relevant legal community); *Camacho v. Bridgeport Fin., Inc.*, 523 F.3d 973, 979 (9th Cir. 2008) (same); *Davis v. Mason County*, 927 F.2d 1473, 1488 (9th Cir. 1991) (using the Western District of Washington as the relevant local community), *overruled on other grounds as recognized in Davis v. City & County of San Francisco*, 976 F.2d 1536, 1556 (9th Cir. 1992). *But see Vega v. Eatherford U.S. LP*, No. 1:14-cv-01790-JLT, 2016 WL 7116731, at *16 (E.D. Cal. Dec. 7, 2016) (concluding that within the Eastern District of California, the appropriate forum for determining the lodestar rate is the division of the district in which the case is filed) (quoting *Jadwin v. County of Kern*, 767 F. Supp. 2d 1069, 1129 (E.D. Cal. 2011)). Finally, the undersigned would note that according to the Local Rules of this court, this is not a district court with separate divisions, as some are, but rather is a single district sitting in designated locations for venue purposes. *See* Local Rule 120.

(Doc. No. 265 at 19.)  In support of these rates, plaintiffs have submitted the Declaration of Thomas A. Vogele, in which he details the expertise and experience of each professional.  (Doc. No. 265-1 ("Vogele Decl.").)  Attorney Vogele graduated from law school in 2007 and was admitted to practice in California that same year.  (*Id.* at ¶ 3.)  Prior to law school, however, attorney Vogele had substantial business experience dating back to the 1970s.  (*Id.* at 5–6.)  This included experience at a large commercial bank, the founding of several businesses, and membership on various boards of directors.  (*Id.*)  Following law school, attorney Vogele began practicing business litigation, and has done so ever since.  (*Id.*)

Attorney Kowal is a shareholder and has also been practicing law since 2007.  (*Id.* at ¶ 14.)  Since that time, he has been engaged in litigation and appellate practice.  (*Id.*)  He has also served as an adjunct professor of civil procedure at the Chapman University Fowler School of Law from 2015 to 2017.  (*Id.*)

Attorney Davis has been practicing law since 2002, giving him roughly 15 years of experience.  (*Id.* at ¶ 15.)  Most of this experience has been devoted to complex civil litigation.  (*Id.*)  The Vogele Declaration also notes that attorney Davis has "extensive trial experience."  (*Id.*)  Attorney Loper graduated from law school in 2011, giving him between five and ten years of experience practicing law.  (*Id.*)

In seeking these rates, plaintiffs rely upon the Laffey Matrix, "a widely recognized compilation of attorney and paralegal rate data[.]"  (Doc. No. 265 at 17.)  They then modify the Laffey Matrix and apply it to the Bakersfield market, since this action arose in Bakersfield.  (*Id.* at 18.)  In opposing this market, defendants assert that this court should apply Fresno rates.  (Doc. Nos. 279 at 15; 283 at 16–17.)  Both parties miss the mark.  As already discussed, the proper rate to be applied is the prevailing rate in the Eastern District of California.  *See Tenorio v. Gallardo*, No. 1:16-cv-00283-DAD-JLT, 2019 WL 3842892, at *4 (E.D. Cal. Aug. 15, 2019); *Firstsource Sols. USA, LLC v. Tulare Reg'l Med. Ctr.*, No. 1:15-cv-01136-DAD-EPG, 2019 WL 2725336, at *7–8 (E.D. Cal. July 1, 2019).  This court recently awarded rates of $525.00 per hour to an attorney with approximately twenty-five years of experience, *see Tenorio*, 2019 WL 3842892, at *4, and a survey of other recent cases within the Eastern District indicates that this is near the top

of the market for hourly rates in this district. *See, e.g.*, *Early v. Keystone Rest. Grp., LLC*, No. 2:16-cv-00740-JAM-DB, 2019 WL 918211, at *5 (E.D. Cal. Feb. 25, 2019) (stating that "the relevant market in this case is the rate prevailing in the Eastern District of California" and approving an hourly rate of $530.00 in an employment discrimination case for an attorney with over 30 years' experience). Because plaintiffs request hourly rates in excess of these rates, some reduction is warranted.

Although attorney Vogele has practiced law for only twelve years, the court also acknowledges his substantial and notable prior work experience. Although not strictly legal in nature, this experience is undoubtedly valuable for one engaged in the practice of business litigation such as this and that approximately thirty years of business experience must be taken into account in setting his reasonable hourly rate. In addition, attorney Vogele was the attorney primarily responsible for the presentation of plaintiffs' case at trial. The court found attorney Vogele to be an effective trial advocate, and there can be no question that he obtained a very favorable result for his clients as a result of his advocacy. Considering these factors, the court concludes that an hourly rate of $500.00 per hour is appropriate as to attorney Vogele's time expended in litigating this case.

With respect to attorney Kowal, he also has been practicing law since 2007. However, the Vogele Declaration does not indicate that attorney Kowal had substantial relevant prior experience. As a result, the court finds that attorney Kowal's hourly rates must be reduced below those awarded to attorney Vogele. Considering his experience, the court concludes that an hourly rate of $400.00 is appropriate here. Given his experience, the court also concludes that a rate of $400.00 per hour is appropriate for attorney Davis.

The court also concludes that a reduction is warranted for the hourly rates of attorney Loper. The court recently awarded an hourly rate of $250.00 to attorneys with roughly five years of legal experience. *See Tenorio*, 2019 WL 3842892, at *4. Attorney Loper, who possesses slightly more experience than that, is entitled to an hourly rate of $300.00.

In his declaration attorney Vogele goes into no detail regarding the legal experience of attorney Polis, leaving the court with no guidance as to her appropriate hourly rate. In addition,

the court has conducted its own research and attempted to ascertain attorney Polis's level of experience based upon her registration with the State Bar of California. However, a search of the State Bar's online system of records reveals that no attorney with the name "Marisa Polis" is licensed to practice law in California. Lacking any detail as to Polis's level of experience (or, for that matter, any indication that Polis is in fact an attorney), the court declines to award any attorneys' fees for the hours she expended on this case.

Finally, the court addresses the hourly rates for each of plaintiffs' paralegals. Plaintiffs request a rate of $150.00 for each. This is at the high end of hourly rates for paralegals in the Eastern District of California. *See Sanchez v. Saul*, No. 1:17-cv-01728-JLT, 2019 WL 2642511, at *5 (E.D. Cal. June 27, 2019) ("Courts in the Eastern District of California have determined that the prevailing hourly paralegal rate is between $75 and $150.") (internal quotation marks omitted). However, the Vogele Declaration provides no detail as to the levels of experience of the paralegals who worked on this litigation for plaintiffs, because of which it would be inappropriate to award fees at the rate requested. The court finds that an hourly rate of $100.00 is reasonable under the circumstances.

In sum, the court will award fees at the following rates:

| **Professional** | **Rate:** |
|---|---|
| Attorney Thomas A. Vogele | $500 |
| Attorney Timothy M. Kowal | $400 |
| Attorney Teddy T. Davis | $400 |
| Attorney Brendan M. Loper | $300 |
| Attorney Marisa D. Polis | $0 |
| Paralegal Angela Brown | $100 |
| Paralegal Kerri Summers | $100 |
| Paralegal Michele Pfeiffer | $100 |

/////

/////

4. <u>Whether the Hours Expended on this Case were Reasonable</u>

The court next considers whether the hours expended on this case by plaintiffs' attorneys were excessive. Both defendants raise multiple arguments on this point, which the court addresses in turn.

        a. *Whether Certain Hours Billed by Attorney Davis Should be Reduced for Block-Billing*

First, Shell identifies four billing entries by attorney Davis that it contends constitute improper block-billing. (Doc. No. 279 at 18.) Shell contends that some of the tasks described in those billing records are not properly compensable as attorneys' fees, and that this manner of billing generally impedes the court's efforts to determine the reasonableness of hours expended. Accordingly, Shell requests a 25 percent reduction in the hours billed by attorney Davis to this matter. (*Id.*)

"'Block billing' is 'the time-keeping method by which each lawyer and legal assistant enters the total daily time spent working on a case, rather than itemizing the time expended on specific tasks.'" *Welch v. Metro. Life Ins.*, 480 F.3d 942, 945 n.2 (9th Cir. 2007). A federal court may appropriately impose a "haircut" percentage reduction that is "no greater than 10 percent . . . based on its exercise of discretion and without a more specific explanation." *Moreno v. City of Sacramento*, 534 F.3d 1106, 1112 (9th Cir. 2008). Block-billing warrants a reduction in the number of hours spent on a matter where, because of the manner of billing, the court cannot ascertain whether such hours could "reasonably be billed to a private client." *Gonzalez*, 729 F.3d at 1202.

As to the four billing entries identified by Shell, the court agrees that these entries constitute block-billing, since the entries list multiple tasks with no description of how much time was spent on each. In addition, some of these tasks do not appear to be legal in nature. For instance, a billing entry on January 14, 2019 states that attorney Davis spent 5.75 hours on "confer[ring] with T. Kowal regarding Pre-Trial statement; begin researching requirements and format of Pre-Trial Statements." (Doc. No. 265-1 at 169.) Researching the formatting requirements for legal documents is not compensable as attorneys' fees, since it is more akin to

clerical work.  *See League of Wilderness Defs./Blue Mountains Biodiversity Project v. Turner*, 305 F. Supp. 3d 1156, 1171 (D. Or. 2018); *Matson v. United Parcel Servs., Inc.*, No. C10-1528 RAJ, 2018 WL 3608396, at *6 (W.D. Wash. July 26, 2018).  The billing entries identified by Shell amount to 22.75 hours, and the court will exercise its discretion and reduce that amount by 2.75 hours, to a total of 20.

However, Shell's request is not limited merely to these four billing entries.  Rather, Shell requests that the court reduce *all* the hours billed by attorney Davis.  The court declines to do so.  Many of attorney Davis's billing records do not suffer from block-billing, and are explicitly legal in nature.  (*See, e.g.*, Doc. No. 265-1 at 161.)  Moreover, it is not this court's role to comb through plaintiffs' billing records on Shell's behalf and identify deficient entries.  *See DeLew v. Nevada*, No. 2:00-cv-00460-LRL, 2010 WL 11636127, at *8 (D. Nev. Jan. 7, 2010) (noting that "it is inappropriate for defendant to delegate to the Court the work of analyzing all billing entries line-by-line in an effort to identify entries the [defendant] might find objectionable") (ellipses omitted); *Ellison v. Balinski*, No. 07-14795, 2009 WL 2057253, at *2 (E.D. Mich. July 15, 2009) ("The Court will not deduct any additional time from [plaintiff's counsel's] billing absent specific objections by Defendants."), *aff'd*, 625 F.3d 953 (6th Cir. 2010).  Shell's request for a further percentage reduction in attorney Davis's hours will therefore be denied.

>    b.    *Whether Certain Hours Billed Should be Reduced for Internal Conferencing*

Next, Shell seeks a reduction in hours billed for internal conferencing among attorneys.  Shell argues that it is unreasonable to bill a client multiple times for the same internal meeting, and that a ten percent reduction of certain billing entries is therefore warranted.

Shell identifies four billing entries for which it seeks a reduction.  The first two are for hours expended on January 28, 2019, by attorneys Davis and Kowal, and the second two are for hours billed on April 8, 2019 by those same attorneys.  (Doc. No. 279 at 19.)  As with the prior entries identified by Shell, the January 28, 2019 billing entries also suffer from block-billing.  For instance, attorney Kowal states that he spent 6.75 hours compiling exhibits, revising and finalizing a joint pretrial statement, having a telephone call with opposing counsel, and meeting

with attorneys Vogele and Davis regarding trial strategy.  (*Id.*)  No effort is made to indicate how much time was spent on each particular task.  The billing entry for attorney Davis suffers from the same defect, and both billing entries appear to bill for the same internal conference.

"While it is reasonable to spend some time coordinating legal resources, it is not reasonable to double or triple-bill a client for internal meetings."  *Gauchat-Hargis v. Forest River, Inc.*, No. 2:11-cv-02737-KJM, 2013 WL 4828594, at *3 (E.D. Cal. Sept. 9, 2013).  The undersigned agrees and, on that basis, will reduce the four entries identified by Shell by ten percent, as requested.  This equates to a reduction of 0.8 hours from attorney Davis and 0.85 from attorney Kowal.

c.  *Whether the Hours Billed in Preparing the Unsuccessful Motion for Summary Judgment Should be Denied*

Next, both Shell and Alon argue that no attorneys' fees should be awarded to plaintiffs for time expended preparing their motion for summary judgment because the motion was ultimately denied and was therefore unsuccessful.

"It is well-settled that a prevailing plaintiff may be compensated for lost battles along the way to winning the war[.]"  *Pierce v. County of Orange*, 905 F. Supp. 2d 1017, 1032 (C.D. Cal. 2012).  Under California law, attorneys' fees are not precluded simply because the prevailing party was unsuccessful on a particular motion.  "To reduce the attorneys' fees of a successful party because he did not prevail on all his arguments, makes it the attorney, and not the defendant, who pays the costs of enforcing the plaintiff's rights."  *Wysinger v. Auto. Club of S. Cal.*, 157 Cal. App. 4th 413, 431 (2007) (internal quotation marks omitted); *see also Akins v. Enter. Rent-A-Car Co. of S.F.*, 79 Cal. App. 4th 1127, 1133 (2000) ("Compensation is ordinarily warranted even for those unsuccessful attacks, to the extent that those attacks led to a successful claim."); *Downey Cares v. Downey Cmty. Dev. Comm'n*, 196 Cal. App. 3d 983, 997 (1987) ("Where a lawsuit consists of related claims, and the plaintiff has won substantial relief, a trial court has discretion to award all or substantially all of the plaintiff's fees even if the court did not adopt each contention raised.").

/////

California courts have applied the federal test to determine the circumstances in which attorneys' fees should be awarded even where a claim was unsuccessful. *See Wysinger*, 157 Cal. App. 4th 413, 430 (2007) (citing *Hensley v. Eckerhart* 461 U.S. 424, 440 (1983)). As the Ninth Circuit has explained that test:

> First, the court asks whether the claims upon which the plaintiff failed to prevail were related to the plaintiff's successful claims. If unrelated, the final fee award may not include time expended on the unsuccessful claims. If the unsuccessful and successful claims are related, then the court must apply the second part of the analysis, in which the court evaluates the significance of the overall relief obtained by the plaintiff in relation to the hours reasonably expended. If the plaintiff obtained excellent results, full compensation may be appropriate, but if only partial or limited success was obtained, full compensation may be excessive.

*O'Neal v. City of Seattle*, 66 F.3d 1064, 1068–69 (9th Cir. 1995). "Claims are related where they involve 'a common core of facts' or are 'based on related legal theories.'" *Id.* at 1069 (quoting *Odima v. Westin Tucson Hotel*, 53 F.3d 1484, 1499 (9th Cir. 1995)).

As stated, both defendants argue that no attorneys' fees should be awarded in connection with plaintiffs' motion for summary judgment. (Doc. No. 124.) Plaintiffs moved for summary judgment as to their ejectment, trespass, and breach of contract claims and the court denied that motion by written order. (Doc. No. 144.) Ultimately, plaintiffs proceeded to trial on claims of trespass and breach of contract, and the jury returned a verdict in plaintiffs' favor on the trespass claim.

Applying the test above, the court easily concludes that attorneys' fees should be awarded on plaintiffs' partial summary judgment motion. First, the successful claims are not merely *related* to the facts and legal theories on which plaintiffs prevailed; in the case of trespass, they are *precisely the same*. The court denied summary judgment after concluding that material factual disputes existed between the parties that could only be resolved by a factfinder at trial. The jury then resolved those disputes in plaintiffs' favor. Because the issues were identical in both the motion for summary judgment and at trial, the first prong is satisfied.

Second, the court finds that despite the unsuccessful motion for partial summary judgment, plaintiffs obtained an excellent result at trial. Neither defendant appears to contest this

41

1    point in their motion.  Therefore, the court declines to deduct any amount from the fee award to

2    account for plaintiffs' unsuccessful pursuit of their motion for summary judgment.

3                    d.        *Whether the Hours Billed in Seeking an Injunction Should be Denied*

4            Alon argues that all attorneys' fees incurred by plaintiffs in seeking an injunction should

5    be reduced.  The court disagrees for substantially the reasons discussed above with respect to the

6    motion for summary judgment:  plaintiffs' attempts to expedite removal of the pipelines was

7    closely intertwined with the issue on which the jury rendered its verdict in favor of plaintiffs,

8    namely whether defendants were wrongfully occupying plaintiffs' property.  The court declines to

9    deduct attorneys' fees related to plaintiffs' seeking injunctive relief.

10                   e.        *Whether the Hours in Researching Damages Under § 3334 Should be*

11                            *Reduced*

12           Next, Alon argues that a substantial reduction in attorneys' fees is warranted because the

13   amount of time spent researching an award of benefits obtained under § 3334 was excessive.

14   Plaintiffs spent 50 hours analyzing this point of law, which Alon claims was unreasonable.

15           Alon is correct to point out that caselaw analyzing this question is limited.  The parties

16   have only cited to three cases that speak to it, and the court's research has not revealed any

17   additional authority.  *See Bailey*, 155 Cal. App. 4th at 783–97; *Starrh*, 153 Cal. App. 4th at 598–

18   602; *Watson Land Co.*, 130 Cal. App. 4th at 76–79.  However, it does not follow that the legal

19   research on this topic was straightforward.  Indeed, the opposite is true.  It is most likely

20   plaintiffs' attorneys were required to devote substantial resources to the issue precisely because

21   § 3334 has not been extensively litigated.  Thus, the court finds no fault in plaintiffs' counsel for

22   using a third-party legislative service to obtain the relevant legislative history.  Nor can the court

23   say that these attorneys' fees were incurred unwisely.  Even accounting for the trespass damages

24   that the court has set aside by this order, benefits obtained under § 3334 make up the vast

25   majority of the jury's verdict in this case.  The court does not find that attorney time devoted to

26   that basis for recovery to be in any way unreasonable.

27   /////

28   /////

f.      *Whether the Hours Expended for "General Litigation" Should be*
        *Eliminated*

Alon next requests that the court deduct hours expended on "general litigation" tasks, which collectively amount to nearly four weeks' worth of time.

Alon's opposition states that these billing entries "provide[] no description" as to the particular tasks involved (Doc. No. 283 at 19), but this is plainly incorrect. Although the billing entries labeled as "general litigation" go on for several pages, an examination of several of them clearly indicates that they are compensable attorney time expended on this case. (*See* Doc. No. 265-1 at 272–286.) They include, for instance, entries for reviewing and finalizing letters to opposing parties, drafting emails to counsel, and researching the local rules of this court. The court finds these entries to be reasonable and the time expended not excessive given the duration of this litigation and the efforts required to see it through to a successful conclusion.

5.      Whether the Court Should Apportion Attorneys' Fees Between the Parties

Finally, the court addresses both defendants' argument that the court is required to apportion the fee award. Shell requests that the court apportion the award equally as between the two defendants, while Alon requests that 83.5 percent be apportioned to Shell, with the remaining 16.5 percent apportioned to Alon. (Doc. Nos. 279 at 21; 283 at 19–21.)

Trial courts possess broad discretion to select the manner of apportionment of fee awards, should they choose to do so. *See, e.g.*, *Hill v. Affirmed Hous. Grp.*, 226 Cal. App. 4th 1192, 1196 (2014); *Zintel Holdings, LLC v. McLean*, 209 Cal. App. 4th 431, 443 (2012). California courts have approved of several methods of apportioning fees, including equal division, apportionment by each defendant's liability, and apportionment by relative time spent litigating against each defendant. *See Friends of the Trails v. Blasius*, 78 Cal. App. 4th 810, 837 (2000) (citing *Grendel's Den, Inc. v. Larkin*, 749 F.2d 945 (1st Cir. 1984)).

Plaintiffs oppose the motion, and generally speaking raise two arguments. First, they point out that if the court denies apportionment, the defendants can seek relief among themselves in an action for contribution. Second, they argue that the defendants were virtually identical for purposes of this litigation. In plaintiffs' words,

> [b]oth defendants operated pipelines on C&C's property. Both defendants refused C&C's demands to remove or relocate the pipelines. Both defendants asserted substantially similar defenses. Both defendants actively and vigorously litigated. Both defendants were represented by the same counsel until late 2018. C&C legal efforts would not have been substantially less or different but for the participation or actions of one or the other defendant.

(Doc. No. 296 at 28–29.)

The undersigned declines to apportion the award of attorneys' fees under the circumstances presented by this case. The court agrees with plaintiffs that until the eve of trial, Shell and Alon were largely indistinguishable as defendants, and in fact were represented by the same counsel. As pleaded, Shell and Alon were treated as joint tortfeasors. Thus, plaintiffs' second amended complaint alleged that all defendants—including Shell, Alon, and Chevron[12]— committed trespass against plaintiffs by operating pipelines on plaintiffs' property. (Doc. No. 103 ("SAC") at ¶¶ 55–63.) The allegations of trespass make no distinction between any of the defendants. Instead, the SAC alleges that as to all of them, defendants "intend to continue to trespass, and therefore continue to deprive Plaintiffs of their right to exclusive possession of the property." (*Id.* at ¶ 59.)

In addition, as a practical matter, it is clear from plaintiffs' trial testimony that they viewed the harm from trespass as essentially indivisible. That is, a trespass by *any* of the defendants was sufficient to cause *all* of the resulting harm. On redirect examination at trial, Craig Carver was asked several questions by plaintiffs' counsel regarding whether the harm could be apportioned to one defendant. First, plaintiffs' counsel asked "if Chevron had removed their pipeline . . . would the Shell and Alon pipelines continue to interfere with the ability to develop the property?" (Doc. No. 234 at 211.) After the court overruled an objection by Shell's counsel and permitted Mr. Carver to answer, Mr. Carver responded "yes." (*Id.* at 212.) Next, plaintiffs' counsel asked "if Chevron and Shell had removed their pipelines upon their behind discovered, but Alon had stayed behind, would the Alon pipeline have interfered with your ability to develop the property?" (*Id.*) Again, Mr. Carver responded "yes." (*Id.*) Plaintiffs' counsel then asked "if, instead of Chevron and Shell, it had been Chevron and Alon, and Shell had stayed, would you

---

[12] Plaintiffs settled their claims with Chevron prior to trial.

44

still be stymied in your ability to proceed with the project?" (*Id.*) Once more, Mr. Carver

answered "yes." (*Id.*) In summing up this colloquy, plaintiffs' counsel asked Mr. Carver "[s]o it

didn't matter which one it was. They were an impediment or interference with the project." (*Id.*)

Mr. Carver answered "yes." (*Id.*) Because Shell and Alon were treated as joint tortfeasors

throughout the trial, and because the court finds nothing to indicate that plaintiffs spent

substantially more time litigating against one defendant than another, the court is not persuaded

that it should apportion the award of attorneys' fees between defendants.

Despite Alon's argument to the contrary, the court finds no basis to reduce the amount of

fees awarded against it based on "the extent of [its] culpability." *Sable Commc'ns of Cal. Inc. v.

Pac. Tel. & Tel. Co.*, 890 F.2d 184, 194 (9th Cir. 1989). Both Shell and Alon were found liable

on the same claim of trespass, and both were found to have acted maliciously, fraudulently, or

oppressively. The court therefore declines to apportion the award of attorneys' fees.

In sum, the court will award attorneys' fees at the following adjusted rates and hours:

| Professional | Requested Rate | Adjusted Rate | Hours | Adjusted Total Award |
|---|---|---|---|---|
| Attorney Thomas A. Vogele | $650 | $500 | 427 | $213,500.00 |
| Attorney Timothy M. Kowal | $650 | $400 | 1015.65 | $406,260.00 |
| Attorney Teddy T. Davis | $550 | $400 | 440.7 | $176,280.00 |
| Attorney Brendan M. Loper | $400 | $300 | 116.75 | $35,025.00 |
| Attorney Marisa D. Polis | $400 | $0 | 4.25 | $0.00 |
| Paralegals | $150 | $100 | 97.55 | $9,755.00 |
| **Total** | | | | **$840,820.00** |

When combined with the attorneys' fees awarded to C&C's prelitigation counsel Mark

Jones of $20,825.00, which neither defendant takes issue with, this equates to a total fee award of

$861,645.00.

**E.    Plaintiffs' Motion for an Award of Prejudgment Interest (Doc. No. 266)**

Next, plaintiffs seek an award of prejudgment interest. (Doc. No. 266.) Plaintiffs argue

that the amount of damages at issue in this case was essentially uncontested, because of which the

45

court should enter judgment against Shell for an additional $8,049,129.00, and against Alon for an additional $1,467,565.00.

Because this court has jurisdiction over this case on the basis of diversity of citizenship, it applies federal procedural law and substantive state law. *See Erie R. Co. v. Tompkins*, 304 U.S. 64, 78 (1938); *Freund*, 347 F.3d at 761. "Prejudgment interest in a diversity action is a substantive matter governed by state law." *U.S. Fid. & Guar. Co. v. Lee Invs. LLC*, 641 F.3d 1126, 1139 (9th Cir. 2011). The relevant statute providing for an award of prejudgment interest under California law is Civil Code § 3287(a), which states that

> [a] person who is entitled to recover damages certain, or capable of being made certain by calculation, and the right to recover which is vested in the person upon a particular day, is entitled also to recover interest thereon from that day, except when the debtor is prevented by law, or by the act of the creditor from paying the debt. This section is applicable to recovery of damages and interest from any debtor, including the state or any county, city, city and county, municipal corporation, public district, public agency, or any political subdivision of the state.

Cal. Civ. Code § 3287(a).

"Damages are deemed certain or capable of being made certain within the provisions of subdivision (a) of section 3287 where there is essentially no dispute between the parties concerning the basis of computation of damages if any are recoverable but where their dispute centers on the issue of liability giving rise to damage." *Duale v. Mercedes-Benz USA, LLC*, 148 Cal. App. 4th 718, 729 (2007); *Fireman's Fund Ins. v. Allstate Ins.*, 234 Cal. App. 3d 1154, 1173 (1991). As the California Court of Appeal has explained,

> the test for recovery of prejudgment interest under Civil Code section 3287, subdivision (a) is whether *defendant* actually knows the amount owed or from reasonably available information could the defendant have computed that amount. The statute does not authorize prejudgment interest where the amount of damage, as opposed to the determination of liability, depends upon a judicial determination based upon conflicting evidence and it is not ascertainable from truthful data supplied by the claimant to his debtor. Thus, *where the amount of damages cannot be resolved except by verdict or judgment, prejudgment interest is not appropriate.*

*Warren v. Kia Motors Am., Inc.*, 30 Cal. App. 5th 24, 44 (2018) (brackets, ellipses, and internal quotation marks omitted); *see also Leff v. Gunter*, 33 Cal. 3d 508, 520 (1983) (noting that

prejudgment interest is available where damages are calculated "mechanically, on the basis of uncontested and conceded evidence").

The court concludes that recovery of prejudgment interest is not warranted here. To begin with, there is no evidence that either Shell or Alon possessed actual knowledge of the amount owed. Moreover, with respect to whether defendants could have computed the amount of damages based on available information, the court finds that disputed facts precluded such a determination prior to trial. The evidence on this point came from plaintiffs' expert Susan Thompson, who calculated benefits obtained based upon information provided by Shell. However, it is one thing to say that Shell possessed the relevant dataset that would enable it to calculate benefits obtained, and quite another to say that the methodology of making such a calculation was obvious or straightforward. Ms. Thompson's testimony demonstrated that it was anything but. For one thing, Ms. Thompson took issue in important respects with the manner in which Shell allocated fixed and variable costs, which led to her reaching a different calculation of benefits obtained. (*See* Doc. No. 238 at 75–76.) For another, Ms. Thompson admitted that even her methodology was debatable, and that a more aggressive set of assumptions could have yielded a much larger amount of benefits obtained. (*Id.* at 81–82.)

In addition, and of particular relevance to Alon, the court notes the large discrepancy between the amount requested by plaintiffs' counsel in his closing argument and the amount actually awarded by the jury. Although attorney Vogele told the jury that the benefits obtained by Alon from trespass amounted to $9,266,452.00 (Doc. No. 241 at 83), the jury in fact awarded $6,058,834.00. (Doc. No. 227 at 3.) To the extent plaintiffs argue that these amounts are "very close" to one another, the undersigned simply disagrees. (Doc. No. 266 at 14.) The jury awarded roughly one-third less than the amount of benefits obtained requested by plaintiffs, and plaintiffs have proffered no explanation as to why. *See Chesapeake Indus., Inc. v. Togova Enterprises, Inc.*, 149 Cal. App. 3d 901, 910 (1983) (noting that an award of prejudgment interest is disfavored where there is a large "degree of discrepancy between the amount claimed and the final judgment in this case").

/////

Finally, plaintiffs' argument that prejudgment interest should be awarded here is belied by plaintiffs' own complaint. In their second amended complaint, plaintiffs alleged that "[t]he potential damages that could proximately result from Defendants' continued trespass would be extremely difficult, if not impossible, to assess accurately, but are estimated in the range of $10 million." (SAC at ¶ 60.) Plaintiffs' own allegations therefore demonstrate that the amount of damages was not reasonably ascertainable.[13] *See Stonebrae, L.P. v. Toll Bros.*, No. C-08-0221-EMC, 2011 WL 1334444, at *22 (N.D. Cal. Apr. 7, 2011) (examining similar language in a complaint and concluding that "[b]y Stonebrae's own admission, the damages then sought were not certain or mechanically calculable"), *aff'd*, 521 Fed. App'x 592 (9th Cir. 2013).

For these reasons, plaintiffs' motion for prejudgment interest (Doc. No. 266) will be denied.

**F.      Plaintiffs' Motion to Amend the Judgment (Doc. No. 267)**

Finally, the court addresses plaintiffs' motion to amend the judgment. (Doc. No. 267.) By this motion, plaintiffs ask the court to alter the judgment and to include a declaration that the Shell and Alon easements are terminated, void, and without legal effect.

Shell and Alon have responded only briefly to plaintiffs' motion. (Doc. Nos. 278, 285.) Shell states that in the event the court declines to grant its motions for judgment as a matter of law and/or a new trial, that it does not oppose the request. (Doc. No. 278 at 2.) For its, part, Alon reiterates its argument that its easement remains legally enforceable against plaintiffs because plaintiffs were not bona fide purchasers of the property as a matter of law. (Doc. No. 285 at 3.) Because the court has already rejected this argument advanced by Alon for the reasons set forth above, and in the absence of any further opposition, plaintiffs' motion (Doc. No. 267) will be granted.

/////

/////

/////

---

[13]  The court also notes that despite plaintiffs' best estimation, the jury did not award anything close to $10 million in damages for trespass.

**CONCLUSION**

For the reasons set forth above,

1.     Alon's motion to alter or amend the judgment (Doc. No. 250) is granted in part;

2.     Shell's motion for judgment as a matter of law, or in the alternative for a new trial (Doc. No. 257), is denied;

3.     Shell's motion to amend the judgment (Doc. No. 258) is granted in part;

4.     Plaintiffs' motion for attorneys' fees (Doc. No. 265) is granted in part;

5.     Plaintiffs' motion for an award of prejudgment interest (Doc. No. 266) is denied;

6.     Plaintiffs' motion to amend the judgment (Doc. No. 267) is granted;

7.     The following easements in the subject property, APN 483-010-29, are hereby terminated, void, and deemed to be without legal effect:

    a.     The easement dated February 8, 1982 originally in favor of Getty Oil Company ("Getty Easement"), claimed by defendant Shell Pipeline Company ("Shell") and admitted into evidence at trial as Exhibit 6;

    b.     The easement dated December 3, 1996 originally in favor of Texaco Exploration and Production Inc. ("TEPI Easement"), claimed by defendant Alon USA Paramount Petroleum Corporation, Alon Bakersfield Property, Inc., and Paramount Petroleum Corporation (collectively, "Alon") and admitted into evidence at trial as Exhibit 11.

8.     The judgment against Shell and Alon is reduced by $670,824.00 as to each defendant;

9.     The judgment is also amended to account for the additional $861,645.00 in attorneys' fees awarded to plaintiffs; and

10.    The Clerk of Court is directed to close this case.

IT IS SO ORDERED.

Dated:   **November 27, 2019**

                                            _Dale A. Drozd_
                                        UNITED STATES DISTRICT JUDGE